Argued and submitted May 30, affirmed in part, reversed in part
and remanded with instructions November 26, 1979,
petitioner's and respondent's reconsiderations denied
January 17, petitioner's and respondent's petitions for
review denied March 11, 1980 (288 Or 667)

# LEWIS AND CLARK COLLEGE,
*Petitioner,*

*v.*

# BUREAU OF LABOR,
*Respondent.*

(No. 5-77, CA 13202

602 P2d 1161

[245]

Susan P. Graber, Portland, argued the cause for petitioner. With her on the brief were Harry S. Chandler, Jeffrey Michael Alden, and Davies, Biggs, Strayer, Stoel and Boley, Portland.

Mary J. Deits, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Thornton, Presiding Judge, and Richardson and Buttler, Judges.

THORNTON, P. J.

Buttler, J., concurring opinion.

Richardson, J., concurring and dissenting opinion.

## THORNTON, P. J.

Lewis and Clark College appeals an order of the Labor Commissioner finding it had discriminated against Dianne Hart in hiring a male applicant for the position of instructor in the college's art department.

In May, 1972, Dianne Kornberg Hart applied for an instructorship in the Art Department of Lewis and Clark College. Two competing male applicants were interviewed for the position. The first rejected the job but the second accepted it. Hart was not interviewed.

The procedure the college followed to fill the position began with the appointment of a five-member "search committee," headed by the chairman of the art department. After an initial screening process, five finalists were selected from among the applicants. According to the college, the finalists were then ranked in order of preference by each of the individual members of the committee. Thereafter, the committee prepared a composite ranking. The applicants were to be interviewed in their order on the composite list until the job was offered to and accepted by one of them. For example, if the highest ranked applicant took the job, the remaining four would not be interviewed. Hart was ranked fifth on the composite list. She had been ranked higher than that by some of the members of the committee, but was ranked lower than the successful applicant by all of the committee members who either prepared individual lists or testified to their recollections of their comparative evaluation of the applicants. However, one of the members had ranked Hart higher than the second male applicant (Orr) who received an interview.

The Commissioner found, in essence, that the ranking system was not the actual basis for determining who would be interviewed, and that the composite list bore no relationshfp to the individual committee members' rankings, but was contrived to facilitate interviews or promote candidacies in accordance with the preferences of the department chairman and the dean.

Hart filed a complaint with the Commissioner of Labor,[1] alleging sex discrimination and retaliation (ORS ch 659). A hearing was conducted before a hearings officer, who issued a proposed order in March, 1978. In December, 1978, the Commissioner issued his final order. He concluded that the college had discriminated against Hart, and ordered, first, that the college pay Hart the difference between the salary and benefits the successful applicant had received during the period July 1, 1972, to December 31, 1976, and the compensation Hart had earned during that period; and, second, that the college offer Hart a teaching position in the art department equivalent in compensation and credit toward tenure to that of an assistant professor with four years' consecutive service.

The college petitions for judicial review. It contends that there was no substantial evidence to support the finding of discrimination, that the Commissioner applied incorrect legal standards, that the college was denied due process because of "ex parte contacts" between the Commissioner and an assistant attorney general, and that the remedy ordered by the Commissioner was improper.

Based upon our reading of this entire record, it is our conclusion that there is not "substantial evidence in the whole record" within the meaning of that term in ORS 183.482(8)(d) to support the Labor Commissioner's finding that Lewis and Clark College discriminated against Dianne Hart on the basis of her sex in choosing Professor Barnes for the position.

The college conceded that Mrs. Hart had established a prima facie case of discrimination but contends that the college's proffered "gender neutral" explanation for its hiring action was sufficient to overcome this prima facie case.

---

[1] At the time the original discrimination complaint herein was filed on October 25, 1977, the State Labor Commissioner was Bill Stevenson. Mr. Stevenson served as Labor Commissioner until January 1, 1979. On that date he was succeeded by Mary Wendy Roberts, who was elected in November, 1978, to a four-year term which expires January 1, 1983.

Even assuming that the college's decision to hire a male applicant without interviewing Mrs. Hart was by itself sufficient to establish a prima facie case of discrimination against her, which is arguable, it would be our conclusion that the college's evidence, which is summarized below and which was unrefuted, was plainly sufficient to overcome this prima facie case and establish that this decision was a matter of legitimate, nondiscriminatory, merit selection by the search committee from among all applicants.

What the evidence shows is that the selection process had narrowed itself down to five finalists, including Mrs. Hart. Under the search committee's procedure for ranking and interviewing the applicants, it was decided in advance that rather than interview all five finalists, applicants were to be interviewed in the order they appeared on the composite list until the job was offered to and accepted by one of them. Thereafter the search committee, after considering Mrs. Hart's application and allied documents and art work along with that of the other finalists, decided to choose another finalist, Professor Barnes, rather than Mrs. Hart, without interviewing her. It did, however, interview two others who were above her on the list, both of whom were males. There was some evidence that a "courtesy interview" with Mrs. Hart was discussed because of Mrs. Hart's husband's official position at Lewis and Clark College, and that this suggestion was subsequently abandoned as unnecessary.

It should be pointed out that no member of the search committee ever ranked Mrs. Hart above Professor Barnes, the male who was subsequently interviewed and hired.

In our view this falls short of establishing a violation of the Oregon civil rights-antidiscrimination laws, ORS ch 659. *Cf. Fajardo v. Morgan*, 15 Or App 454, 516 P2d 495 (1973).

By way of background, we find the following persuasive: Between 1946 and 1978 there have been only

four full-time faculty positions in the art department at Lewis and Clark College. These positions were in Painting and Drawing (since 1946), Art History (since 1947), Ceramics and Sculpture (since 1949), and Calligraphy (since 1951). Twelve different individuals have held these positions, of whom three have been women (Alice Asmar—Painting and Drawing (a tenured position), Henrietta Perry—Art History (a tenured position), and Cindy Reinold—Art History. In addition to the full-time positions, the art department now includes part-time positions in Weaving, Sculpture, and Painting. A total of 13 women have been employed on the art department faculty. In addition, the full-time position in art history filled by Stewart Buettner in 1973 was first offered to a woman, Martha Hutson, who declined the offer.

The college makes a number of arguments in connection with its general contention that the Commissioner did not apply correct legal standards. We have considered those arguments and conclude that they do not require discussion.

The college also assigns error to what it describes as the ex parte assistance of the attorney prosecuting the case in the preparation of the final order. The college refers to the assistance provided the Commissioner by an assistant attorney general who had represented the agency before the hearings officer. The interrelationship of state agencies and personnel from the Department of Justice, who sometimes act in quasi-prosecutorial as well as advisory roles in agency proceedings, is a potential source of complicated legal and ethical problems. In this case, the contact between the Commissioner and the assistant attorney general was initiated by the Commissioner, and took the form of the assistant attorney general speaking with the Commissioner and drafting the final order on the Commissioner's behalf. Before the contacts occurred, the hearing officer's proposed order, which was adverse to the college, had been served on the parties, and the college had filed exceptions. Nothing in the record suggests

that the Commissioner did not make his own findings, or that the assistant attorney general did more than embody the Commissioner's findings in "legal language." Under these facts, we discern no possible prejudice to the college. *Gregg v. Racing Commission*, 38 Or App 19, 24-25, 588 P2d 1290, *rev den* 286 Or 637 (1979).

We do conclude, however, that there was substantial evidence to support the Commissioner's finding that after Mrs. Hart filed her antidiscrimination complaint with the Bureau of Labor, the college did inform Mrs. Hart that if she were to persist with her complaint she would not be considered for any future openings in the art department and that on November 3, 1973, Hart sent Professor Shores a letter reapplying for any positions which might become open in the art department; that at least one opening for which she was qualified did become open between the time the letter was transmitted and the date of the hearing; that the college failed to consider Mrs. Hart for this position; and that the inference is permissible that this constituted retaliatory action against her for filing a complaint. ORS 659.030(1)(d).

In view of our disposition of this case, we vacate the sanction imposed and remand for reconsideration in the light of this opinion of an appropriate sanction for the college's retaliatory actions referred to in the previous paragraph.

Affirmed in part, reversed in part, and remanded with instructions.


**RICHARDSON, J.,** concurring in part; dissenting in part.

I concur in that part of the majority opinion which holds that there was substantial evidence to support the Commissioner's finding that the college retaliated against Hart. I also agree with the majority, although for different reasons and in different particulars, that

the remedial portion of the Commissioner's order must be reversed in part and remanded. However, I do not agree with the majority's disposition of the principal issue in this case—whether there was substantial evidence to support the Commissioner's findings and his conclusion that the College discriminated against Hart.

As the majority notes, the College concedes that Hart made a prima facie showing of discrimination. That means, in essence, that she proved she applied for the position, that she was qualified for the position, that she was not interviewed or hired, and that a male applicant was interviewed and hired. Those facts constitute a prima facie case under the United States Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 US 792, 93 S Ct 1817, 36 L Ed 2d 668 (1973), and later decisions relating to burden and order of proof in discrimination cases under Title VII of the Civil Rights Act of 1964 (42 USC § 2000e *et seq.*). Under *McDonnell Douglas*, after the complainant makes such a prima facie showing, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for its action. 411 US at 802. If the employer articulates such a reason, the burden is on the complainant to prove that the employer's purported reason is not the actual reason or is a pretext.

The College argues that, here, it articulated such a reason, and that Hart did not prove that that reason was not the actual basis for the hiring action. Both parties assume that *McDonnell Douglas's* definition of burden and order of proof is applicable in discrimination cases before the Commissioner. It is unnecessary for us to decide whether that assumption is correct. Under any theory of burden of proof, the issue before us is whether there was substantial evidence in the record that the College's proffered "gender neutral" explanation for its action did not satisfactorily explain the action.

[252]

The crux of the College's explanation was that its selection system was based on merit, that the system resulted in an offer being made to and accepted by an applicant higher on the search committee's list than Hart, and that she was therefore not interviewed. Also central to the College's explanation was the proposition that graphic skills rather than communicative and teaching skills were the principal criteria of selection, and that the interview process was therefore not indispensable to an evaluation of the applicants' comparative qualifications.

The Commissioner found that the faculty hiring procedures to which the College refers were in a developmental phase at the time in question, that no "rigid or definite" procedures were communicated to the members of the committee, and that there was no concensus on the committee about hiring methodology.

The Commissioner also found that, to the limited extent the procedures were nominally operational, they were not followed. The names on the composite list were rearranged to suit the needs of the moment and the desires of the dean of the College and the department chairman. For example, Orr was moved from fourth to second on the list to enable the dean to interview him while on a trip to California. The College offers no reason why, if the brief geographical proximity between the dean and Orr justified changing his position on the list and interviewing him, Hart's continuous proximity with the interviewers was a less compelling reason for treating her similarly.

Although there was some testimony by search committee members that graphic skills were the main qualification for the position, there was also testimony by three of the four members of the committee that teaching and communicative skills were of greater importance. The Commissioner so found.

The Commissioner's ultimate finding (4) was that:
"In terms of the consideration of a candidacy, the only meaningful, significant consideration took place

[253]

at the Search Committee interview. The denial of an interview to Hart constituted a denial of a consideration of her candidacy. I further find that given the Search Committee's commitment to finding a candidate capable of generating and renewing enthusiasm, that the only way the presence of this quality could be detected and measured was by means of an interview."

In my view, both the majority and concurring opinions miss the thrust of the Commissioner's findings, which was that, from the inception, the putative search procedures were a sham. They were freely abandoned to meet every contingency except interviewing Hart, although *every other* qualified finalist (and one who was not qualified) were interviewed. While the College contended that visual rather than communicative skills were emphasized, with the implication that interviews were not important in evaluating the applicants, the Commissioner found from their testimony that the search committee members were concerned with communicative abilities and that an interview was therefore central to the evaluation process.

The majority and concurring opinions do not explain why the evidence fails to support the Commissioner's findings. The majority opinion says only that certain factual findings it enumerates, some of which the Commissioner did make and son..e of which he did not, have substantial support in the record. That is not the issue. The issue is whether the Commissioner's findings are supported by substantial evidence, and not whether different findings we might make if we were the triers of fact also have evidentiary support. Similarly, the majority's recitation of the art department's history of female hiring is consistent with the evidence, but so are the Commissioner's findings that no woman has achieved tenured status on the studio art faculty, at least since 1946, and only one woman was ever hired to fill a "tenure track" position—the kind of position Hart sought—on that faculty.

[254]

The concurring opinion notes that the Commissioner made no express finding of discrimination in the process before Barnes was offered and accepted the job, and the opinion infers from that that the Commissioner found the earlier stages of the selection process to have been nondiscriminatory. It is true that terms such as "sex discrimination" do not appear in the text of each of the findings. However, it was not necessary for *every* finding and conclusion to refer to "discrimination" for discrimination to be found and for the conclusion that the college discriminated against Hart to follow from the findings. As described in detail above, the Commissioner found that the College's proffered explanation failed to explain its action. Under *McDonnell Douglas* and its better reasoned progeny, the conclusion that discrimination occurred would automatically follow from the employer's "legitimate, nondiscriminatory reason" being disproved or rejected. *Cf. Wheelock College v. Massachusetts Commission Against Discrimination*, 371 Mass 130, 355 NE 2d 309, 314-315 (1976). Assuming that *McDonnell Douglas* does not apply in this proceeding, the Commissioner's finding that the College's proffered explanation did not account for its action left the further factual question of whether discrimination or something else was the correct explanation of the action. In this context, as in many others, the trier of fact may and usually must infer the actor's subjective motivation or intent from surrounding circumstances. The circumstances here were wholly consistent with a finding and conclusion that Hart was not interviewed or considered because of her sex.

The concurring opinion notes that the Commissioner, in order to arrive at his ultimate findings, concluded that the chairman of the art department, Professor Shores, was not credible. The opinion suggests that the Commissioner could not make credibility findings because he did not see and hear the witnesses but made his decision from a review of the record made by the referee. The opinion notes that the Commission-

er, thus, is in no better position than we are to evaluate credibility.

If the conclusion to be made from that analysis is that we make a different credibility evaluation and thus different findings, the simple answer is that we review for substantial evidence while the Commissioner must review the record and make discrete findings. This implies a duty on the part of the Commissioner as fact finder to evaluate the witnesses' statements and accept or reject them in varying degrees.

On the other hand, if the conclusion is that the Commissioner cannot make credibility findings because he has not observed the witnesses testifying, the simple answer is that credibility (more properly weight) is determinable from a number of factors other than witness demeanor. The credibility, *i.e.*, weight, that attaches to testimony can be determined in terms of the inherent probability, or improbability of the testimony, the possible internal inconsistencies, the fact it is or is not corroborated, that it is contradicted by other testimony or evidence and finally that human experience demonstrates it is logically incredible.

The Commissioner's findings that he did not think Professor Shores' testimony was credible was explained in the order. The finding was based on factors other than the witness's demeanor while testifying and has a basis in the record before the Commissioner.

The Commissioner's findings and conclusions that Hart was discriminated against should be affirmed.

I agree with the majority that the remedial portion of the order must be reversed in part and remanded. However, some of the issues raised by the College regarding the remedy for discrimination would apply to remedial action respecting unlawful retaliation.

In *School District No. 1 v. Nilsen*, 271 Or 461, 534 P2d 1135 (1975), the Supreme Court considered the scope of the Commissioner's authority in providing

[re]medies for discriminatory practices, and specifically [co]nsidered certain remedies similar to those ordered [by] the Commissioner here. The Court stated in *Nilsen*:

"It is our conclusion that the legislature did not intend to vest in the Commissioner completely unfettered discretion to the extent that the Commissioner could issue an order without some showing of necessity therefor. * * *" 271 Or at 495.

*Accord, Fred Meyer v. Bureau of Labor*, 39 Or App 253, [5]92 P2d 564, *rev den* 287 Or 129 (1979). The Supreme [C]ourt further indicated in *Nilsen* that whether there is [a] "showing of necessity" for a particular remedial [or]der is primarily an evidentiary question. *See, also, [W]illiams v. Joyce*, 4 Or App 482, 479 P2d 513, 40 [A]LR3d 1272, *rev den* (1971).

The College argues that the Commissioner's award [of] four and a half years' back pay and the requirement [th]at Hart be hired as an assistant professor with four [ye]ars' seniority cannot be substantiated because "[t]here is no evidence to support an assumption that [H]art would have been retained beyond one year of [em]ployment if she had been selected for the position." [Th]e Commissioner argues that the remedy is au[th]orized by ORS 659.010(2), which empowers him to [in]clude in cease and desist orders requirements that [an] employer who has engaged in an unlawful practice "[e]liminate the effects" of that practice, and to make [th]e victim of discrimination whole. *Cf. Albemarle Paper Co. v. Moody*, 422 US 405, 95 S Ct 2362, 45 L Ed 2d [28]0 (1975).

Teachers are initially hired by the College in a [pr]obationary capacity and must generally teach for [se]ven consecutive years before they are awarded te[nu]re. While teachers are in the probationary period, [th]e College may or not renew their contracts. The [su]ccessful applicant for the position Hart sought held [th]at position for six years. Thereafter, having failed to [ob]tain tenure, he ceased being a faculty member. [Du]ring the six years he was on the faculty he was [em]ployed through a series of annual contracts. The

Commissioner found that, compared to the successful applicant, Hart's teaching experience was the more "complete, comprehensive and responsible." He also found that Hart was actively seeking employment, including teaching positions, during the period from 1972 through 1976. As the Commissioner notes, it cannot be "proved" that, had she been hired, Hart would or would not have remained in the position for the four and a half years covered by the back pay award. However, I consider that the combined evidence of Hart's qualifications, the successful applicant's length of service, and Hart's availability for work is sufficient to support a finding that she would have remained in the position for at least that length of time, and is therefore sufficient to support the Commissioner's award of back pay.

A more complicated question is presented by the portion of the Commissioner's order directing the College to offer Hart an assistant professorship with four years' credit toward tenure. In *School District No. 1 v. Nilsen, supra,* the Commissioner directed the employer school district to rehire certain probationary teachers who had been improperly required to resign because of pregnancy, and to give those teachers immediate tenured status. The Supreme Court stated:

> "* * * [W]e believe the Commissioner may not, in the absence of specific authorizing provisions, require the District to hire unneeded teachers. The Commissioner may require that those probationary teachers who were forced to resign because of pregnancy be recompensed for losses they incurred thereby, but the District cannot be forced to hire teachers in the absence of need. The paragraph [of the order] may be amended, however, to require the District to give those who have been forced to resign because of pregnancy preference in openings for which they are qualified.
>
> "We also believe the Commissioner lacks the authority to require the District to give such teachers immediate tenure, although they have not taught for the necessary probationary period, merely because

they would have had tenure by this time had they not been forced to resign. The District has not completed evaluating their competency. Providing competent teachers for children is as important in the scheme of things as are the individual rights of teachers to have tenure. * * *" 271 Or at 497-98.

The situation here differs from *Nilsen* in two material respects: first, the burden upon the College of absorbing one "unneeded" assistant professor would arguably not be as great as the burden upon the school district in *Nilsen* of hiring the several teachers there involved; and second, the College is not being directed by the Commissioner to give Hart *immediate* tenured status, but is, in effect, being required to reduce the evaluation period for the award of tenure from seven years to three years.

Although the present situation differs from *Nilsen*, the similarities are greater than the differences. While the single "unneeded" hiring which the Commissioner's order requires entails a smaller number of positions than was involved in *Nilsen*, the faculty size of the College is obviously far smaller than the entire teaching force of School District No. 1. The College should not be compelled to offer or consider Hart for a position on the art faculty until such time as a position for which she is qualified is available.

I would also conclude that the College should not be compelled, at such time as a position is offered to and accepted by Hart, to give her four years' advancement toward tenure. Although the College would have three years from the time of hiring to consider her qualifications for tenure, a longer period is considered necessary by the College for a proper evaluation. Accordingly, the College should not be involuntarily required to give Hart a different level of credit toward tenure from that accorded other starting faculty members in comparable positions.

I would remand the matter to the Commissioner of Labor for issuance of a new order which deletes the

[259]

present paragraph (3), or amends the paragraph to require only that the College give Hart preferential consideration for any openings which may arise for which she is qualified, and which deletes the requirement that she be given credit toward tenure. In all other respects, I would affirm the order.

**BUTTLER, J.,** concurring.

I concur with the majority opinion that there is not substantial evidence in the whole record to support the Commissioner's finding that the college discriminated against Ms. Hart on the basis of her sex. I also agree that the record supports, by substantial evidence, the Commissioner's finding that the college retaliated against Ms. Hart in violation of ORS 659.030(1)(d) because she filed a discrimination claim with the Bureau of Labor. I disclaim, however, the majority's consideration of, and decision on, the college's claim of denial of due process based on the fact that the Assistant Attorney General, who was the college's adversary in the contested case hearing, participated with the Commissioner in the preparation of the Commissioner's findings and order after the college objected to the Referee's proposed order. I see no reason to decide that question, and seriously doubt that the record here permits a decision on it. Rather, if the question is to be decided, we should appoint a special master pursuant to ORS 183.482(7).[1]

With respect to the Commissioner's conclusion that the college discriminated against Ms. Hart on account of her sex, some elaboration is in order. Nowhere does the Commissioner find that the ranking of the final five candidates was motivated by the sex of the appli-

---

[1] ORS 183.482(7) provides:

"Review of a contested case shall be confined to the record, the court shall not substitute its judgment for that of the agency as to any issue of fact. In the case of disputed allegations of irregularities in procedure before the agency not shown in the record which, if proved, would warrant reversal or remand, the Court of Appeals may refer the allegations to a Master appointed by the court to take evidence and make findings of fact upon them."

[260]

nt, or that the initial procedure by which the search mmittee was to select an applicant for the opening as motivated by the sex of the applicant. The procere may not have been the best one, or even a good e, but unless it has a disparate impact on women ither the Commissioner nor this court may hold that e procedure was unlawful.

The Commissioner did find that the committee nked the applicants so as to arrive at an order in ich each would be interviewed.[2] He further found at the first ranked candidate, Professor Paul, was terviewed first. While the committee members were ry impressed with Professor Paul, he was eliminated er a discussion with the dean of the art department, ofessor Brown, who expressed the view that Professor Paul should not be offered the job because he ked a Master of Fine Arts degree. This requirement o eliminated Professor Pawula, who would have en interviewed second. The third candidate on the mposite list was Barnes, followed by Orr and Hart.

Under the procedure as initially established, rnes would have been interviewed next. However, an Brown, while visiting Stanford University on other matter, had met with Orr, was impressed with n and suggested that the committee interview Orr xt.[3] Not surprisingly, the committee did so; the

---

[2] The dissent states:

"* * * Also central to the College's explanation was the proposition that graphic skills rather than communicative and teaching skills were the principal criteria of selection, and that the interview process was therefore not indispensable to an evaluation of the applicants' comparative qualifications."

college did not contend that the interview was not important; it ended only that under the procedure adopted not all applicants would terviewed before a decision was made, and the evidence is undisputed the procedure was followed in this respect.

[3] The dissent states:

"* * * The names on the composite list were rearranged to suit the needs of the moment and the desires of the dean of the College and the department chairman. For example, Orr was moved from fourth to

Commissioner found that Orr was interviewed ahead of Barnes because the Committee acceded to the Dean's request, not because of any sexual bias. Orr was offered the job, but the offer was rejected. Had he accepted, the process would have ended there. Based upon the interview of Orr ahead of Barnes, the Commissioner found that the Search Committee "abandoned their order of ranking,"[4] but he did not find that the decision to interview Orr ahead of Barnes was tainted or motivated by considerations of sex, or that Dean Brown was motivated in any way by preference of a male over a female applicant.

Barnes was interviewed after Orr rejected the college's offer, was offered the job and accepted it. It is not until this stage of the proceedings that the Commissioner finds that there was discrimination against Hart on account of her sex. He bases that finding on his determination that Hart was at least as qualified as Barnes, if not more so, and would have been interviewed next if she had not been female.

If, however, the initial ranking of the candidates and the initial procedure was not unlawfully tainted, I can see absolutely no basis for a finding or conclusion that the process became discriminatory when the ranking list was reduced to the final two applicants.

<hr>

second on the list to enable the dean to interview him while on a trip to California. The College offers no reason why, if the brief geographical proximity between the dean and Orr justified changing his position on the list and interviewing him, Hart's continuous proximity with the interviewers was a less compelling reason for treating her similarly."

With all due respect, those statements distort the record and the findings. The *only* instance in which an applicant was moved up on the composite list was the Orr incident, and that was not done "to enable" Dean Brown to interview Orr. It was done *after* Brown had talked to Orr while the dean was visiting Stanford on another matter. On his return the dean suggested the committee interview Orr next because he was an impressive candidate.

[4] The dissent states "the thrust of the Commissioner's findings" was that "the putative search procedures were a sham" from the inception. There is no such finding. The Commissioner did find that the committee abandoned its order of ranking, but the only instance found was that relating to Orr.

I conclude that not only does the evidence not support the Commissioner's findings, but that the findings do not support his conclusions with respect to discrimination in hiring. ORS 659.030(1)(a).

One further note: the referee, in his proposed order, made no findings with respect to the credibility of any of the witnesses. The Commissioner, however, in order to reach some of the findings he made was required to conclude that Professor Shores, chairman of the Search Committee, was not credible. Although we usually attach weight to the credibility findings of the fact finder, we do so because the fact finder normally sees and hears the witnesses at the time the testimony was given. In this case, however, the Commissioner did not see and hear the witnesses, and is in no better position to evaluate their credibility than we are. *See Nunlie et ux. v. Hunt*, 211 Or 472, 316 P2d 528 (1957); *Brennan v. Good Samaritan Hosp.*, 4 Or App 178, 189, 471 P2d 831, 476 P2d 931 (1970), *rev den* (1971).

This is not to say that the Commissioner may not find certain testimony not credible where, for example, it is internally inconsistent or is inherently incredible; however, the inferences which lead him to so find must be reasonable. And I do not consider reasonable the Commissioner's rationale for finding Professor Shores not credible.

With the foregoing elaboration, I concur in the decision of the majority.