In the Matter of the Marriage of

## Daniel H. MOORE,
*Appellant,*

*and*

## Kristy M. MOORE,
*Respondent.*

(94DO-0062-MS; CA A91175)

934 P2d 572

Greg O'Neill argued the cause and filed the brief for appellant.

Charles Denkers argued the cause and filed the brief for respondent.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

DE MUNIZ, J.

**DE MUNIZ, J.**

Husband appeals a dissolution judgment, assigning error to the trial court's award of custody and child support. We review *de novo* and reverse.

In August 1990, while still single, wife and husband had sexual relations. Wife was 17, and husband was 18 years old. After she learned that she was pregnant, wife applied to Adult and Family Services Division (AFSD) for public assistance. As part of her application, wife filed an affidavit asserting that husband was the father of the child and that he was the only man with whom she had had sexual relations within 30 days before or after the time of conception. At some point, wife also contacted husband about her pregnancy, and he agreed to accept responsibility for the child. A few months before the child was born, wife began living with husband. The child was born on June 3, 1991, and the parties were married on July 4.

The parties temporarily separated in August 1991. Husband provided some support to wife. However, wife also applied for Aid to Dependent Children for herself and the child. As a result of that application, the Oregon Department of Justice, Support Enforcement Division (SED), initiated proceedings that led to a judgment requiring husband to pay support for the child.

Husband and wife reconciled in December and again lived together until the summer of 1992. After the parties' final separation in September 1992, wife and the child moved to Washington. Husband visited with the child, although the parties disagree about how often he visited. In October 1993, wife wrote out an agreement[1] giving husband temporary custody. However, in December, wife appeared with the police at

---

[1] The agreement provided:

"I [wife] give [husband] temporary custodial guardianship of [child] on October 31st 1993 till we both decide on if this is going to be permanent.

"Signed [wife]

"[Husband] must have medical coverage on [child]. Visitation is available at both of our convenience.

"We'll try this arrangement till [child's] 3rd birthday on June 3rd 1994." (Spelling corrected.)

husband's residence, denied signing the agreement and demanded the child's return. The child then lived with wife until February 1994 when husband, under disputed circumstances, again obtained custody.

The day after he obtained custody, husband petitioned for dissolution of the marriage and requested custody of the child, alleging that the child was born of the marriage. He also moved for a temporary restraining order and for temporary custody. The court issued an order prohibiting, *inter alia*, either party from changing the child's residence. It also ordered wife to show cause why the motion for temporary custody should not be granted. In opposition, wife filed an affidavit claiming that husband is not the biological father. Following a hearing on that motion, the court issued a default order[2] granting temporary custody to husband. However, the court later ordered the parties to submit to paternity tests. The results of the tests excluded husband as the child's father.

Before trial, husband moved to exclude any evidence that he is not the father of the child. The gravamen of his argument was that wife should be estopped from denying his paternity.

At the custody hearing, the parties offered conflicting testimony about whether wife had told husband that he was not the biological father. Although wife admitted to misleading husband into believing that he was the father until just before the child's birth, she insisted that husband knew he was not the father before the child's birth. Husband equally insisted that wife did not tell him that the child was not his.

The court also heard testimony from AFSD and SED representatives. Apparently, AFSD records originally listed husband as only a *possible* father. However, when SED began its actions to enforce support, the records indicated that wife had represented husband as *the* father.[3] Consequently, paternity was not a concern to SED, and it issued

---

[2] Wife originally proceeded *pro se* and failed to file a timely answer or motion.

[3] It is not clear whether the records showed that husband was considered the father because of wife's 1990 affidavit or because of some subsequent assertion by wife.

only a notice and finding of financial responsibility. Husband responded to that notice promptly and consented to the entry of an order of support. SED then issued an administrative support order that was certified and docketed with the court under the provisions of ORS 416.440.

The court denied husband's motion to exclude evidence refuting his paternity. It found that husband had failed to show that "he was misled into assuming support of [the child] in an action instituted by [SED] at the behest of [wife] in which she asserted that [husband] was [the child's] father." It also found that he is the psychological, but not the biological, parent of the child. The court then concluded that there were not compelling reasons to award husband custody and awarded custody to wife. It granted husband visitation and ordered him to pay child support.

Husband argues that the trial court erred in denying his motion to exclude evidence of his nonpaternity and, consequently, that he should be granted custody under the "best interests" test. Alternatively, he argues that, as a psychological parent under ORS 109.119(1), the court should have applied a best interests test. Should those arguments fail, he argues that there are "compelling interests" to award him custody.

Wife responds that the court did not err in excluding evidence of husband's nonpaternity and, because the evidence showed that husband is not the biological parent, he must demonstrate "compelling interests" under ORS 109.119(1) to be awarded custody of the child. She argues that "compelling interests" do not exist and that the award of custody to her is in the child's best interests.

We begin with the question of whether wife should be estopped from denying husband's paternity. Husband argues that wife is estopped from denying his paternity under alternative theories of judicial estoppel,[4] equitable estoppel, and laches. On appeal, as at the trial level, husband's primary

---

[4] In general, judicial estoppel is a common-law equitable principle that precludes a party from asserting a position that is inconsistent with a position that the party successfully asserted in a different judicial proceeding. *Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 609-10, 892 P2d 683 (1995).

argument is that wife is judicially estopped from denying his paternity. He argues that the appropriate issue is not whether he was misled but whether wife successfully asserted an inconsistent position at another judicial proceeding. Wife responds that judicial estoppel does not apply because wife was not a party to the support judgment secured by SED.[5] Because we conclude that wife is equitably estopped, we need not reach husband's arguments on judicial estoppel and laches.

We have previously held that a wife can be estopped from denying her husband's paternity when a husband has detrimentally relied on a wife's false assertions. *Sleeper and Sleeper*, 145 Or App 165, 929 P2d 1028 (1996), *rev allowed* 325 Or 367 (1997); *Hodge and Hodge*, 84 Or App 62, 733 P2d 458, *rev den* 303 Or 370 (1987); *Johns and Johns*, 42 Or App 39, 599 P2d 1230 (1979); *compare Warren and Joeckel*, 61 Or App 34, 656 P2d 329 (1982). However, it is not always necessary that a husband show that he was misled into believing he is the *biological* father in order to estop a wife from denying paternity.

In *Sleeper*, we concluded that the wife was estopped from denying the husband's paternity even though the husband knew or should have known that he was not the biological father.[6] That conclusion was based on the following factors: the husband had initiated the custody proceedings in his petition for dissolution, both parties had represented to everyone that husband was the father, the wife had not attempted to deny his legal paternity at any time prior to his petition, and the husband believed that he was listed as the father on the birth certificate. 145 Or App at 170. In particular, we noted that, as the children's primary caretaker, the

---

[5] Although we do not reach husband's judicial estoppel argument and therefore do not decide whether wife was a party under the facts of this case, we note that ORS 416.407 provides that, in "any proceeding under ORS 416.400 to 416.470, * * * an obligee who has physical custody of a child for whose benefit a support order * * * is sought" is a party to that proceeding. Here, the record does not reveal whether wife was served with a copy of SED's initial notice and finding as required under ORS 416.415, and husband does not rely on the statute in his judicial estoppel argument.

[6] In *Sleeper*, the husband had had a vasectomy several years before the children were born and was incapable of fathering a child.

husband had developed "a long-term, deeply involved and continuing relationship" with the children. *Id.* In *Hodge*, where the child was three years old before the parties separated, we relied on similar circumstances to find that the wife there was also estopped from denying the husband's paternity. 84 Or App at 65.

Although *Johns* involved different facts, it is consistent with *Sleeper* and *Hodge*. There, we found that the wife had represented not only to the husband but also to state authorities that the husband was the father in order to obtain support from him. 42 Or App at 43. In fact, the wife had waited until one year after the initial dissolution order to challenge the husband's paternity. However, we did not rely solely on that factor in our conclusion that the wife was estopped from denying the husband's paternity. Instead, we specifically noted that both the child and the husband had relied on that representation to establish a parent-child relationship in the two-plus years preceding the custody hearing. *Id.*

In contrast, in *Warren and Joeckel*, 61 Or App 34, 656 P2d 329 (1982), we held that the wife was not estopped from denying paternity. In that case, the child was conceived before the marriage and was less than a year old when the parties separated. Although both parties had signed the birth certificate listing the husband as the father, they disputed whether the wife had represented to the husband that he was the father. No specific finding was made regarding that issue. However, we found that the husband would have married the wife even though he was not certain that the child was his and that the husband had not established sufficient reliance on the wife's representations.[7] *Id.* at 41.

Here, as in *Warren*, the child was conceived before marriage, and the parties disagree on what wife told husband and when. The trial court did not specifically decide that issue but found only that husband was not misled into assuming support of the child. That could mean that the

---

[7] We also note that we found that "credible evidence belie[d] his contention that he had accepted parental responsibility," 61 Or App at 39, although we did not specifically rely on that finding to conclude that the wife was not estopped.

court either found that wife told husband that he was not the father or at least told him that there was a possibility that he was not the father.[8] Although there is no evidence to suggest that the parties would have married if the child had not been born, credible evidence exists that husband married wife at least knowing that he might not be the father. However, there the similarities to *Warren* end.

As in *Sleeper*, here husband initiated the custody proceedings and wife responded, asserting that husband was not the father. Unlike *Sleeper*, wife appears to have given inconsistent representations to third parties as to husband's paternity. However, both wife and husband represented to Oregon state officials that husband was, indeed, the father. Wife filed an affidavit with AFSD representing that husband was the only possible father. At the time wife submitted the affidavit, she was informed that naming her child's father would allow her to get additional assistance. Wife was served with a copy of the administrative order, which stated that a judgment would be entered against husband.[9] However, it was not until husband brought these proceedings,[10] more than two years after the support judgment was entered, that wife denied husband's responsibility for the child.

Finally, although husband was not always the child's primary parent, wife allowed sufficient time to pass before challenging husband's paternity for husband and the

---

[8] We reject any notion that husband *knew* that he was not the father. Before the paternity test, husband had no information that he was not the father other than what wife told him. Given that husband and wife had sexual intercourse near the time of conception, husband could not have *known* that he was not the father on the basis of wife's assertion alone.

[9] ORS 416.415(1)(b) requires that the obligee also must be served with SED's initial notice and finding. However, there is no evidence in the record to show whether that was done here.

[10] Washington Department of Health and Social Services records show that wife named husband and another man as absent fathers in September of 1992. Also, those records apparently revealed a third possible father around the same time. However, nothing in those records constituted a denial of husband's paternity. Oregon state records make no mention of any other possible fathers until November 1994, when wife applied for benefits for herself and the child. At that time, wife listed another man as the child's father and made no mention of husband. Although that could be considered a denial of husband's paternity, it was not made until well after husband filed his petition, and we do not treat it as such.

child to develop a parent-child relationship. Husband testified that he loved the child from the moment he was born. Before the parties' final separation, the child had lived with husband off and on for about one year. During that time, husband took an active role in the child's care when he was not at work. After the parties' final separation, when the child was one-and-a-half years old, husband had long, although sporadic, visits with the child. Wife testified that she had wanted the child to have a father and had encouraged that relationship. Further, the agreement, which wife wrote herself, granting custody to husband for over seven months with the possibility of permanent custody, confirms not only that the relationship existed but that wife encouraged it.[11] The record also shows that, at least up until this action was commenced, the child considered husband to be his father. George Cocores, a therapist who had met with husband and the child on several occasions from May 1995 until the trial in July 1995, testified that their parent-child bond was very strong.

We conclude that wife is estopped from denying husband's paternity. Wife represented to public assistance authorities that husband was the only possible father, which led to entry of a support judgment against him. She wrote an agreement acknowledging his potential right to permanent custody, a recognition that she agreed that husband was to be considered the child's father. It is clear that, even if wife informed husband that he was not the child's biological father, both he and the child nevertheless relied on her encouragement to develop a child-parent relationship. Wife cannot assert and deny fatherhood at her convenience.

Because wife is estopped from denying husband's paternity, we must decide custody based on the best interests of the child. *Sleeper*, 145 Or App at 171; *Hodge*, 84 Or App at 65; ORS 107.137(1).

We first address the parties' assignments of error regarding the trial court's evidentiary rulings that bear on

---

[11] Husband testified that wife had called, asking him to take the child permanently because she could not handle him any more. Although wife testified that she gave the child to husband because she needed male assistance with potty training and that originally the child was to visit for only a month, the agreement belies that possibility. We accept husband's testimony as the truthful version of the event.

that issue. Husband's assignments are not well taken, and we affirm the trial court's rulings on those issues without further discussion. Wife cross-assigns as error the trial court's admission of testimony by Burton, a doctor specializing in psychiatry, who was a medical consultant to the counseling center wife used from December 1992 until January 1994. He consulted with wife's counselor regarding medication for her depression and sleep disorder. Wife objected to his testimony on the grounds that she had not waived her physician-patient privilege.

On appeal, wife repeats her trial court argument that Burton's testimony should have been excluded under the physician-patient privilege provided in OEC 504-1. However, the trial court appears to have treated the issue as arising under the psychotherapist-patient privilege found in OEC 504. That rule creates a privilege for confidential communications to a psychotherapist and creates an exception, *inter alia*, for communications relevant to a patient's mental or emotional condition in any proceeding where that condition is an element of the patient's claim. The rule defines psychotherapist as a person who is authorized by law to treat or diagnose a mental or emotional state or reasonably thought by the patient to be so authorized, if the person is actually engaged in such treatment or diagnosis. OEC 504(1)(c). That definition is broad enough to include medical doctors engaged in mental health treatment. Laird C. Kirkpatrick, *Oregon Evidence* 247 (2d ed 1989); Legislative Commentary to OEC 504 (quoted in *id.* at 243). We need not decide which privilege applies because Burton's testimony is not critical to our ultimate determination. On *de novo* review, we do not consider it. We now turn to the issue of the child's custody.

In determining a child's custody, we must give primary consideration to the best interests of the child. ORS 107.137(1). Because the trial court concluded that husband must prove "compelling interests" to be awarded custody, it made no findings concerning the child's best interests. Therefore, we must make that determination without the benefit of the trial court's observations. In our determination, we consider:

"(a) The emotional ties between the child and other family members;

"(b) The interest of the parties in and attitude toward the child;

"(c) The desirability of continuing an existing relationship; and

"(d) The abuse of one parent by another." ORS 107.137(1).

No one factor is dispositive. ORS 107.137(2).

Here, although we give due respect to the trial court's opportunities to see and hear witnesses, *Thompson and Thompson*, 103 Or App 458, 797 P2d 1077 (1990), the trial court made no credibility findings, and, in any event, this is not a situation where the trial court's evaluation of credibility would be decisive. Credibility can be determined from a number of factors other than simply observing a witness's demeanor:

"The credibility, *i.e.*, weight, that attaches to testimony can be determined in terms of the inherent probability, or improbability of the testimony, the possible internal inconsistencies, the fact it is or is not corroborated, that it is contradicted by other testimony or evidence and finally that human experience demonstrates it is logically incredible." *Lewis and Clark College v. Bureau of Labor*, 43 Or App 245, 256, 602 P2d 1161 (1979), *rev den* 288 Or 667 (1980) (Richardson, J., concurring in part, dissenting in part).

Our review of the record shows that, soon after conception, wife told husband that he was the father. She presented a false affidavit to state authorities asserting that husband was the only possible father. She lied to state police when she denied writing the temporary custody agreement. Contrary to the temporary court order not to change the child's residence, she and a long-time friend, Terry Waits, took the child from husband's home without his permission. During that incident, Waits impersonated a Children's Services Division (CSD) employee.[12] Wife also admits that, during

---

[12] Shortly after taking the child, wife and Waits were stopped by state police, and the child was returned to husband. Waits subsequently pled guilty to impersonating a CSD employee. On cross-examination, Waits also admitted she had

the temporary custody hearing, she and Waits' son, Steve Scott, lied under oath that they planned to marry in an attempt to convince the judge that her life had become more stable. Those incidents show not only that wife continues to have no hesitation about lying but that she also has no hesitation about getting others to lie on her behalf. Finally, although wife testified that she knew that the trial "was her last chance" and that she had to tell the truth, numerous inconsistencies in wife's testimony indicate that her pattern of untruthfulness has not changed. It is in the light of wife's pattern of deceit that we weigh the "best interest" factors as to each party.

■ When evaluating the emotional ties between a child and other family members, we consider, among other things, which parent has been the "primary caretaker or is the more nurturing parent." *Holcomb and Holcomb*, 132 Or App 498, 503, 888 P2d 1046, *rev den* 321 Or 94 (1995) (citing *Boldt and Boldt*, 104 Or App 379, 382, 801 P2d 874 (1990)). As previously discussed, wife was the child's primary caretaker until October 1993, about the first two years of the child's life. At that time, wife signed the agreement giving husband custody of the child. From that time until the trial court granted custody to wife in August 1995, when the child was four years old, husband was the child's primary caretaker.

The child has maintained strong bonds with wife, and husband admits that the child sometimes clung to wife and whined at visitation exchanges. Dr. Wes Reilly, a psychologist called to testify by wife, saw the child two times, in April and May of 1995. He testified that the child loves wife but does not love husband. According to Reilly, the child is afraid of husband, although the child would not explain why.

Cocores, a counselor hired by husband, testified that there was a strong parent-child bond between husband and the child. He also testified that the child enjoyed the time he spent with husband and that the child had expressed no clear preference as to which parent he would like to live with. Cocores had over 20 contacts with husband and child and

prior convictions for two counts of aggravated theft in the first degree, two counts of computer crime, and two counts of forgery in the first degree.

saw the child about 10 times from May 1995 until trial. We find Cocores testimony more persuasive than Reilly's.[13] Because of the child's close bonding with husband, and the fact that husband had been the child's primary caretaker for almost two years at the time of trial, we conclude that this factor weighs in husband's favor.

We next consider the parties' "interest * * * in and attitude toward the child." ORS 107.137(1)(b). Witnesses testified about numerous instances when wife neglected the child, such as leaving him alone or in the care of small children when he was only a toddler. There is also evidence that the child was not fed properly while in wife's custody and that physicians were concerned about his growth rate. Wife's upstairs neighbor summoned the police on numerous occasions in December 1993 and January 1994, because she heard wife and the child screaming at each other and loud banging at very late hours. Finally, after giving temporary custody to husband, it appears that wife's primary motivation to retrieve the child before the time called for in the temporary custody agreement was based on her fear that she might lose her low-income housing if the child was not living with her.[14]

Wife insists that she has changed. She earned her GED. Since the temporary custody hearing, she has completed a parenting class and attends church regularly. She plans on being married to the father of her second child, who was born in April 1995. She has also improved her relationship with her family. Her mother testified that wife is a good mother to her new child and has developed her parenting skills.

Although wife has improved, husband's commitment has been more consistent. When he learned of wife's

[13] We also note that testimony at trial suggests that wife encouraged the child's clinging during visitation exchanges.

[14] In order to keep her low-income housing, wife's apartment had to have two occupants. Wife's apartment manager confronted wife with this fact after she learned that the child was living with husband. Also, the state police officer who accompanied wife testified that her desire to retrieve her child did not appear to be motivated by parental concern but by some sort of gain.

pregnancy, he brought her home to live with him and supported her. He and his family accompanied wife to birthing classes and attended the child's birth. While he was living with wife, he took care of the child when he was not working. When wife was considering giving the child up for adoption, husband tried to convince her to give him custody instead. Although his visits with the child after his final separation from wife may have been sporadic, it was husband who wanted the child permanently when wife believed she could no longer care for him. Further, under his care, the child's eating habits were better and his growth rate improved. Although we do not doubt that wife loves the child, we conclude that husband has exhibited a healthier interest and attitude toward the child.

■     In considering "the desirability of continuing an existing relationship," we attempt to maintain the existing positive relationship between a parent and a child. *Holcomb*, 132 Or App at 506. Although both parties have a continuing relationship with the child, at the time of trial the child had been with husband for almost two years. In addition, Cocores testified that disrupting the bond between husband and the child would be damaging to the child. Consequently, this factor weighs in favor of husband's custody.

Finally, we consider the extent to which the evidence shows "abuse of one parent by the other." We find no credible evidence of abuse by either party. Accordingly, this factor does not weigh for or against either party.

Having weighed all the factors, we conclude that awarding custody of the child to husband is in the child's best interests. The trial court erred in awarding custody to wife and, consequently, also erred in awarding wife child support and attorney fees.

Reversed and remanded with instructions to enter judgment awarding custody to husband, with reasonable visitation to wife, and child support in accordance with child support guidelines. No costs to either party.