Argued and submitted January 28, 2002, reversed January 8, 2003

PREFERRED FUNDING, INC.,
a Washington corporation,
*Respondent,*

*v.*

Alfred JACKSON;
Richard Harger;
Harger & Jackson,
an Oregon partnership;
and Neighbors Bar & Bistro, Inc.,
an Oregon corporation,
*Appellants.*

16-99-13001; A112729

61 P3d 939

Jeffrey E. Potter argued the cause for appellants. With him on the briefs was Gardner, Honsowetz, Potter, Budge & Ford.

Donald J. Churnside argued the cause for respondent. With him on the brief was Gaydos, Churnside & Baker, P.C.

Before Edmonds, Presiding Judge, and Kistler and Schuman,* Judges.

SCHUMAN, J.

---

* Schuman, J., vice Armstrong, J.

**SCHUMAN, J.**

In this dispute, plaintiff is a commercial lender seeking to foreclose on assets in the possession of defendants, who received the assets from a third party in an allegedly fraudulent transfer. Plaintiff prevailed on all three of its claims, two under the Uniform Fraudulent Transfer Act (UFTA) and one under the Uniform Commercial Code (UCC). We review legal issues for errors of law and factual determinations *de novo. Morris v. Nance*, 132 Or App 216, 218, 888 P2d 571 (1994), *rev den*, 321 Or 340 (1995). We reverse.

Except as noted, the following facts are not in dispute. Some time in 1996, Wayne Jarvis and Clifton Platt discussed plans to open a bar and restaurant in Eugene. Platt borrowed $120,000 from a company called "Associates," and put up around $50,000 of his own money, and the two men began remodeling a former McDonalds fast food outlet. On April 16, 1997, they formed Wy-Cliff Corporation as an entity to operate the business, which they planned to call Neighbors Bar & Bistro." Jarvis and Platt were the corporation's directors. On November 5, 1997, before opening the establishment for business, Platt borrowed $270,000 at 13.9 percent interest from plaintiff, a company specializing in "hard money" loans, that is, loans that more traditional lenders like banks regard as too risky. The loan agreement identified the borrower as Clifton Platt, "a single man." It also specified that the loan was secured by a note and trust deed executed by Platt "in his individual capacity" for Platt's personal residence, as well as "all supplies and materials to be used in connection with the rehabilitation and expansion of Mohawk Video and Neighbors Restaurant and Night Club." Of the $270,000, Platt received approximately $94,000. The rest went to plaintiff as a "loan origination fee" ($16,200), to pay off Associates (so that plaintiff could have priority on the collateral), and to miscellaneous closing costs.

On December 29, 1997, Wy-Cliff opened its business, Neighbors Bar & Bistro. On January 15, 1998, Platt and Jarvis registered "Neighbors Bar & Bistro" as an assumed business name of Wy-Cliff Corporation. Meanwhile, plaintiff prepared to file a financing statement (a "UCC-1" form) with

the Corporation Division to secure the $270,000 loan, naming "Clifton E. Platt, DBA Neighbors" as the debtor and listing the collateral as "[a]ll furniture, Fixtures and Equipment" located at Neighbors, "1417 Villard Street, Springfield, Oregon." In fact, Neighbors was located in Eugene, not Springfield; most of the fixtures were owned by the building's landlord, not Platt; and the equipment and other tangibles were owned by Wy-Cliff. Plaintiff filed the form on January 29, 1998.

Neighbors did not open well. It lost money from opening day and by March it was in serious debt—according to Platt and Jarvis, it was in danger of closing. Two regular customers of the establishment, defendants Jackson and Harger, learned of this state of affairs from Jarvis. They had recently retired to the Eugene area after selling a business in Hawaii and had money available for investment. They consulted an attorney, who ran a credit check on Platt, performed a "UCC check" on Wy-Cliff that showed no secured creditors, and then decided to loan Wy-Cliff $70,000. Jarvis testified that, when defendants[1] made this loan, they knew about the preexisting debt to plaintiff. Defendant Jackson testified that they did not. In any event, on March 26, 1998, Harger & Jackson filed a "UCC-1" form naming Wy-Cliff as debtor and listing as collateral all of Wy-Cliff's tangible and intangible assets.

Within a few days, plaintiff, having learned that Platt was behind in payments on his $270,000 loan, filed an action in Lane County Circuit Court, *Preferred Funding, Inc. v. Platt*, to foreclose on the collateral—Platt's residence and the tangible assets of Platt's businesses. A number of events occurred while that action was pending.

First, defendants loaned additional funds to Wy-Cliff, thereby making Wy-Cliff's debt to defendants approximately $168,000, including interest.

Second, Platt and defendants began to suspect Jarvis of mismanagement and financial irregularities, so

---

[1] Defendants include two individuals, Harger and Jackson; their partnership, called Harger & Jackson; and a corporation of which they were part owners, Neighbors Bar & Bistro, Inc. Jackson was the only defendant who testified at trial. Like the parties and the trial court, we presume that he testified on behalf of himself, Harger, and the partnership.

when Jarvis left town for a vacation, Platt had the locks changed on the office doors at Neighbors. He called a meeting of Wy-Cliff's board of directors (himself and Jarvis) and sent notice of the meeting to Jarvis by registered mail. The meeting occurred in September. Jarvis did not attend. At the meeting, Platt removed Jarvis as president and a director of Wy-Cliff. Thereafter, defendant Jackson began playing an active role in overseeing the financial affairs of Wy-Cliff.

Third, Platt received a notice from defendants informing him that Wy-Cliff was in default on the $70,000 loan and accelerating payment in full.

Fourth, shortly thereafter, defendants and Platt, with the assistance of an attorney, formed a new corporation called Neighbors Bar & Bistro, Inc. Defendants were 51 percent shareholders, and Platt owned 49 percent. Almost immediately, however, Platt conveyed his shares to his parents. He testified that he did so because the Oregon Liquor Control Commission would not issue Neighbors Bar & Bistro, Inc., a hard liquor license if he was listed as an owner, due to a past felony conviction.

Fifth and finally, on November 3, 1998, again with the assistance of an attorney, Wy-Cliff executed an "Asset Transfer Agreement" (ATA) conveying all of the assets of Wy-Cliff, tangible and intangible, to defendants. In return, defendants forgave Wy-Cliff's debt to them, which, with interest, amounted to $168,155. This is the allegedly fraudulent transfer of assets in plaintiff's UFTA claims.

In December 1998, after the ATA had divested Wy-Cliff of all its assets, the Lane County Circuit Court decided *Preferred Funding, Inc. v. Platt.* The court's opinion recited that "plaintiff has proven by a preponderance of the evidence that defendant [Platt] acted as an agent for WY-CLIFF in securing the loan from plaintiff," and, for that reason, "WY-CLIFF is liable to plaintiff for all amounts owing." The court entered a judgment against Platt and Wy-Cliff in the amount of $310,370.24, holding that both Platt and Wy-Cliff were liable for the total amount and that plaintiff was entitled to foreclose on Platt's residence and the "personal property" listed in the trust deed, namely "all supplies and materials to be used in connection with the rehabilitation and expansion of Mohawk Video and Neighbors

Restaurant and Night Club." Discovering that Wy-Cliff had transferred all its assets, plaintiff filed this action against defendants, the transferees, under the UFTA and the UCC. The trial court, adopting the findings and conclusions of the court in *Preferred Funding, Inc. v. Platt* and making additional findings of its own, concluded that Wy-Cliff's transfer of assets to plaintiff was a fraudulent transfer as defined by the UFTA and that plaintiff could be restored to its pretransfer status by allowing it to foreclose on its security interest against defendants. Defendants appeal, listing 10 assignments of error, all of which reduce to the assertion that neither the UFTA nor the UCC provides plaintiff with the right to foreclose on defendants' assets.

We begin with the UFTA claims. The principal statute at issue, ORS 95.230, provides:

"(1)   A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

"(a)   With actual intent to hinder, delay, or defraud any creditor of the debtor; or

"(b)   Without receiving a reasonably equivalent value in exchange for the transfer or obligation * * *[.]"

The parties agree that the central issue in the UFTA claims is the value of the assets Wy-Cliff transferred to defendants. That is so because the statute applies only to the transfer of an "asset," and property is not an asset "to the extent that it is encumbered by a valid lien * * *." ORS 95.200(2)(a). In other words, only "equity in excess of the amount of the encumbering lien(s) is an 'asset' under UFTA." *Oregon Account Systems, Inc. v. Greer*, 165 Or App 738, 745, 996 P2d 1025 (2000). The property that Wy-Cliff transferred to defendants was encumbered by a valid lien in favor of defendants in the amount of $70,000. Thus, if the value of the bar as a going concern, including its tangible and intangible assets, was less than $70,000 on the date of the transfer, then Wy-Cliff did not transfer any assets to defendants and no predicate exists for plaintiff's action under the UFTA.

The trial court found that "[t]he reasonable retail market value of the 'equipment' component of [Wy-Cliff's] assets was $10,000 (based on a wholesale appraisal of $6,400). The business itself was valued at $200,000, including the equipment." Plaintiff acknowledges that we review the record in UFTA cases *de novo*, but nonetheless, citing *Hannan v. Good Samaritan Hosp.*, 4 Or App 178, 187, 471 P2d 831 (1970), *adh'd to on reh'g*, 476 P2d 931, *rev den* (1971), urges us to give "great weight" to the trial court's findings. Insofar as findings reflect the trial court's opportunity to assess credibility based on witness demeanor, we are inclined to defer. However, credibility depends not only on demeanor but also on such factors as " 'inherent probability, or improbability of the testimony, the possible internal inconsistencies, the fact that it is or is not corroborated, that it is contradicted by other testimony or evidence and finally that human experience demonstrates it is logically incredible.' " *Allen v. Meinig*, 109 Or App 341, 347-48, 819 P2d 744 (1991), *rev den*, 313 Or 209 (1992) (quoting *Lewis and Clark College v. Bureau of Labor*, 43 Or App 245, 256, 602 P2d 1161 (1979), *rev den*, 288 Or 667 (1980) (Richardson, J., concurring in part, dissenting in part)). The evidence regarding the value of Wy-Cliff's assets is largely documentary; to the extent that it derives from testimony, it is assertions of opinion the accuracy of which would not be reflected in demeanor. Unlike a witness's statement that he or she did or did not perform some act or possess some knowledge, a witness's opinion about the market value of a business is not more or less likely to be accurate depending on whether the witness has sweaty palms and a quivering voice. We therefore examine the evidence with complete independence.

There is not much of it. Plaintiff, who has the burden of proving by a preponderance of the evidence that a fraudulent transfer of assets took place, *see Morris*, 132 Or App at 223, relies on the following facts: First, defendants invested nearly half a million dollars in the business, so its value at the time of the transfer must have been substantial. Second, defendant Jackson's financial statement submitted to OLCC as part of an application for a liquor license reported the net worth of the business as $109,366. Third, Jarvis testified that the business was worth $200,000.

Those facts do not amount to persuasive evidence that the value of Wy-Cliff's assets at the time of transfer exceeded $70,000. The fact that Neighbors's backers had spent nearly $500,000 on a business that within 10 months of opening could not pay its employees, its landlord, or its suppliers, much less its investors, does not establish that the business had significant value as a going concern. If anything, it establishes that the business was a hopeless money loser. If, as plaintiff asserts, the business was still operating at the time of trial, some 13 months after the transfer, and if, as the record does not show, it was operating at a profit, it seems likely that it was doing so *despite* the reputation, name, and "good will" it took over from Wy-Cliff, not *because* of them.

Nor does Jackson's handwritten and self-prepared financial statement to the OLCC provide a credible assessment of the business's value. The statement lists $180,574 in assets and $71,208 in liabilities. The assets include $168,155 in "fixtures and equipment." Jackson testified that he entered that number by mistake, and, although his intention is debatable, the inaccuracy of the number is not. Although we venture no guess where the figure came from, we note that it is the precise amount Wy-Cliff allegedly owed to Harger & Jackson. In any event, it is not the value of fixtures and equipment. Estimates of the value of the fixtures and equipment at Neighbors vary, but *no* estimate is larger than $20,000, and that one came from Jarvis. A qualified expert testified that the assets and equipment were worth $6,400 and that he could refurbish and sell them for a maximum of $10,000. Taking the $10,000 estimate as the value of fixtures and equipment instead of the $168,155 listed by Jackson, the correct amount of Neighbors's assets on the OLCC form would be $22,419, that is, the amount listed ($180,574) minus Jackson's number ($168,155) plus the correct number ($10,000).

Jarvis's estimate is also unworthy of serious consideration. That estimate comes in one sentence of testimony. Plaintiff's attorney asked Jarvis, "What was the value of the bar as a business?" He replied, "If I were to go buy the bar, if I were shopping for a bar and I said, I like that bar, what are you asking for it, I would expect to pay in the neighborhood of

probably $200,000 for it." We find no reason to credit that estimate. The record reveals considerable hostility between Jarvis and defendants. More importantly, nothing in the record indicates that Jarvis had any training or experience in the bar or restaurant business beyond his brief involvement in the failure of Neighbors. When he and Platt met, he was in the janitorial services business, cleaning the carpets at Platt's video store.

In short, plaintiff presents some evidence that the value of Wy-Cliff's assets, including its intangible assets, exceeded $70,000 at the time of transfer, but that evidence is not persuasive. It contradicts the evidence given by Platt, Jackson, and Jackson's former attorney, all of whom testified that, at the time of the transfer, Neighbors's liabilities exceeded its assets. Even if we were to accept the highest estimate of Neighbors's tangible assets, plaintiffs would still have to show by a preponderance of the evidence that there was more than $50,000 worth of intangible assets associated with this failing and debt-ridden business that, in its short history, had run through nearly $500,000 without ever showing a profit. Plaintiff has not met that burden. When Wy-Cliff transferred its assets to Harger & Jackson, the lien against those assets exceeded their value. Therefore, no transfer of assets, as that term is defined in the UFTA, occurred.

Plaintiff also asserts the right to foreclose on defendants' assets under the UCC on the theory that, when the ATA transferred Wy-Cliff's assets to defendants, plaintiff retained its security interest in the assets because defendants took them in bad faith. That theory depends on the proposition that plaintiff had an enforceable security interest in Wy-Cliff's assets, a proposition that depends, in turn, on the proposition that plaintiff's valid security interest in Platt's assets—the only security interest for which there is a financing statement—is in reality an interest in Wy-Cliff's assets because Platt acted as Wy-Cliff's agent in obtaining the loan. Plaintiff argues, in other words, that (1) plaintiff has a valid security interest in Platt's assets, (2) Platt and Wy-Cliff are the same entity, and (3) defendants received the assets from Platt/Wy-Cliff knowing that plaintiff had a prior secured interest in them. The conclusion they urge is that plaintiff therefore has a valid security interest against the

assets in the hands of the transferees, defendants. Defendants respond that this logic fails fatally at step (2): Platt owned the assets in his own name and in his individual capacity. Thus, plaintiff never had an enforceable security interest against Wy-Cliff and, as a consequence, has no enforceable security interest against Wy-Cliff's transferees. We agree with defendants.

The governing statute, ORS 79.2030 (1999),[2] provides:

"(1)   [A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

"(a)   * * * [T]he debtor has signed a security agreement which contains a description of the collateral * * *;

"(b)   Value has been given; and

"(c)   The debtor has rights in the collateral."

Wy-Cliff is the debtor, that is, the entity against which the security interest may be enforced, only if Wy-Cliff signed the security agreement, received value, and had rights in the collateral. But Platt, not Wy-Cliff, signed the agreement, received value, and had rights. Therefore, unless plaintiff can prove that Platt was acting as an agent for Wy-Cliff, plaintiff cannot enforce its interest.

To prove that Platt acted as Wy-Cliff's agent, plaintiff relies exclusively on the judgment in the earlier case, *Preferred Funding, Inc. v. Platt*, where the court found that Platt "acted as an agent for WY-CLIFF in securing the loan from plaintiff." As noted above, the trial court in the present case "accept[ed] and adopt[ed]" that conclusion.

We note preliminarily that plaintiff cannot assert that defendants are precluded by the judgment in *Preferred Funding, Inc. v. Platt* from arguing that Platt acted for himself. Defendants were not parties to that case, were not in privity with any party in that case, and had no opportunity to be heard on the issue. Preclusion therefore does not apply

---

[2] The statute was amended and renumbered as ORS 79.0203. Or Laws 2001, ch 445, § 13.

against them. *Nelson v. Emerald People's Utility Dist.*, 318 Or 99, 103-04, 862 P2d 1293 (1993).

Further, in adopting the "findings, conclusions and judgment" in the earlier case, the trial court here did not (and could not) adopt the evidence in that case. The legal conclusion that Platt acted as Wy-Cliff's agent, therefore, must be supported by a preponderance of the evidence *in this case*. Again, we review that evidence *de novo*, ORS 19.415(3). Again, there is not enough of it to support plaintiff's assertion—perhaps because plaintiff neither pleaded nor explicitly argued in this case that Platt was Wy-Cliff's agent. What the evidence does show is that Platt was careful to sign all of the documents involving the loan in his individual capacity, not as a corporate employee or on behalf of a corporate principal. In those documents, the debtor is "Clifton E. Platt, a single man * * * in his individual capacity" (loan agreement), "Clifton E. Platt, an unmarried person" (promissory note), and "Clifton E. Platt DBA Neighbors" (financing statement). The loan was secured by, among other things, Platt's personal residence. The 50 percent shareholder in the corporation at the time the loan was negotiated, Jarvis, testified that, to his knowledge, Wy-Cliff never borrowed money from plaintiff. The only evidence supporting the theory that Platt acted on behalf of Wy-Cliff is the fact that the proceeds of the loan were spent on developing Wy-Cliff's business, Neighbors. In light of the contrary evidence, that is not sufficient. Plaintiff never had an enforceable security interest against Wy-Cliff, so it has none against its transferees.

In sum, on *de novo* review, we conclude that no fraudulent transfer of assets, as that term is defined by the relevant statute, occurred and that plaintiff, although it may have had a security interest on collateral owned by Platt, had no enforceable security interest on collateral owned by Wy-Cliff and therefore could not foreclose on that collateral in the hands of Wy-Cliff's transferee, defendants.

Reversed.