Argued and submitted March 16, affirmed on appeal and cross-appeal September 28, 2011, petition for review denied March 22, 2012 (351 Or 675)

Nola FADEL,
in her capacity as Personal Representative
of the Estate of Claryce J. El-Tobgy, Deceased,
*Plaintiff-Respondent*
*Cross-Appellant,*

*v.*

Sami H. EL-TOBGY,
*Defendant,*

*and*

Mona M. EL-TOBGY,
*Defendant-Appellant*
*Cross-Respondent.*

Washington County Circuit Court
C080654CV; A141215

264 P3d 150

Margaret H. Leek Leiberan argued the cause for appellant - cross-respondent. With her on the briefs was Jensen & Leiberan.

Matthew Whitman argued the cause for respondent - cross-appellant. With him on the briefs was James R. Cartwright.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.*

HADLOCK, J.

---

* Hadlock, J., *vice* Rosenblum, S. J.

## HADLOCK, J.

This elder-abuse case stems from defendant Sami El-Tobgy's financial exploitation of his mother, Claryce El-Tobgy, in the six years preceding her death at age 93. Plaintiff is Claryce's other child and initiated this litigation in her capacity as the personal representative of Claryce's estate. The operative complaint included two claims.[1] First, plaintiff alleged that Sami and his ex-wife, defendant Mona El-Tobgy, had financially abused Claryce, a vulnerable person, in violation of ORS 124.110.[2] Second, plaintiff alleged that Sami fraudulently transferred real property and other assets to Mona in their divorce, in an effort to shield those assets from Claryce and other creditors. Plaintiff prevailed on most of her claims at trial and the trial court entered judgment accordingly. The court also awarded plaintiff prejudgment interest and some, but not all, of the attorney fees she sought under ORS 124.100. On appeal, Mona assigns error to various rulings related to both the elder-abuse and fraudulent-transfer claims; she also challenges the prejudgment interest and attorney fee awards. Plaintiff cross-appeals, challenging the trial court's decision to award her only a part of the attorney fees she sought. We affirm on both the appeal and the cross-appeal.

Although plaintiff did not file her complaint until after Claryce died, only events that preceded Claryce's death are important to this appeal.[3] Claryce and her husband lived

---

[1] After plaintiff filed her original elder-abuse complaint in October 2006, the trial court dismissed that case for reasons not important here. Plaintiff appealed, but later dismissed that appeal and filed a new complaint in January 2008. The parties' litigation of the claims alleged in that second complaint resulted in the judgments that are presently before us on appeal.

[2] ORS 124.100 to 124.140 create a civil cause of action for damages resulting from the physical or financial abuse of vulnerable persons. The term "vulnerable person" is defined to include an "elderly person," that is, "a person 65 years of age or older." ORS 124.100(1)(a), (e)(A).

[3] Although the parties strongly disagree about the significance of various facts—particularly those related to whether Sami or Mona had more control over the family finances—they agree that they are bound by the jury's finding that Sami financially abused Claryce. Accordingly, we discuss the evidence related to that elder-abuse finding in the light most favorable to plaintiff, who prevailed before the jury on that claim. *Jensen v. Medley*, 336 Or 222, 226, 82 P3d 149 (2003). Our standard of review is different for plaintiff's claim under the Uniform Fraudulent Transfer Act (UFTA). As explained later in this opinion, to the limited extent that

in Egypt for many years before his death in 1997. Claryce, plaintiff, and Sami each inherited a substantial amount of money from Claryce's husband, and Claryce moved to the United States in 1999 to live with Sami and his then-wife, Mona.

Sami and Mona owned three houses, the one in which they lived and two rental properties. Claryce and Sami moved into one of the rental houses shortly after Claryce returned from Egypt. Sami also set up joint bank accounts with Claryce, including a Wells Fargo account that initially held about $445,000 of the money that Claryce had inherited. Less than two weeks later, Sami moved $250,000 from that account into a Dean Witter account that was set up solely in his name.

By the year 2000, relatively little money was left in the Wells Fargo account that Sami and Claryce held jointly. Plaintiff discovered that the account had been depleted and hired a lawyer, who sent Sami a letter asking what had happened. Claryce later told plaintiff that Sami had returned the money to her account; she also told plaintiff's attorney that she was satisfied with Sami's handling of her finances.

Even after Sami and Mona started living apart, their finances remained entwined for several years. In October 2002, Sami and Mona visited Wells Fargo, where they had an account that held the funds that Sami had inherited from his father. A Wells Fargo consultant stated in his deposition that Mona was angry because she thought that Sami "had inappropriately spent Claryce's money" and, therefore, "was fearful of her own account * * *." The same consultant testified at trial that Mona had expressed concern "that Sami would do the same thing with the Sami/Mona account that he [had done] with the Sami/Claryce account." Consequently, Sami and Mona agreed that the assets in their joint account should be transferred to an account in Mona's name only.[4]

---

Mona's appeal challenges any of the trial court's findings related to that equitable claim, we review the record *de novo*. *See* 245 Or App at 706 nn 9, 10. In any event, with minor exceptions that we have noted, the parties do not appear to dispute the basic sequence of events that we have outlined in this opinion.

[4] At trial, Mona disputed that version of events, indicating that she had not told the consultant why the money should be transferred to her individual account.

In May 2003, plaintiff, who lived in Texas, became concerned because Claryce's telephone had been disconnected. Plaintiff called police and the matter was referred to Adult Protective Services (APS). An APS investigator visited Claryce, who was home alone and stated that Sami had told her that they were switching telephone services and the telephone would be reconnected later. After several unsuccessful attempts, the investigator managed to contact Sami and convey her concerns about Claryce being left home alone without telephone service. Plaintiff subsequently told the investigator that the telephone had been reconnected, and APS closed its file in July 2003 after it gave Sami additional information about services available to Claryce.

Sami and Mona also had a joint investment account with Morgan Stanley. In August 2003, a Morgan Stanley advisor met with the couple and recommended that they change the instructions associated with their account so that both of them would have to approve any withdrawal and neither of them could withdraw money individually. The advisor made that recommendation because he believed that Mona and Sami were having marital difficulties and each of them was questioning what the other was doing with their money. Sami and Mona followed the recommendation. After his meeting with Sami and Mona, the Morgan Stanley advisor noted that Mona had said, during the visit, "that Sami owes some people money and that he needs to take care of that himself and he's not able to handle the finances."

Later that month, Sami and Mona transferred title to their three houses, which they previously had held as tenants by the entirety, into Mona's name alone. Sami and Claryce continued to live in one of those houses rent free, and Sami paid the property taxes most years. Sami explained in his deposition that he decided to put the houses in Mona's name to protect them from potential "mishandling" on his part, like mortgaging the properties.

In June 2005, plaintiff called APS to report that Claryce's cardiologist was becoming reluctant to treat her because a bill had gone unpaid. Plaintiff also reported that

She also testified that she was concerned about Sami's misuse of their children's money, not by his handling of Claryce's funds.

she felt she was being isolated from Claryce. Shortly thereafter, plaintiff traveled to Oregon and met with the same APS investigator who had followed up on plaintiff's 2003 concerns. That investigator learned that the outstanding cardiologist bill was about $13,000, and she visited Sami to ask him why he had not paid it. The investigator told Sami about the laws related to financial exploitation and elder abuse; Sami assured her that he would pay the bill.

In July 2005, the APS investigator spoke with the cardiologist's bookkeeper, who reported that Sami had paid only about $100 on the bill since August 2004 and had "said that there was no money." The investigator and one of her colleagues visited Sami and Claryce, and asked Sami why he still had not paid Claryce's bill. Claryce said she wanted to know what was going on, and the investigator told her that her medical bills were not being paid and that Sami had said there was no money. Claryce told the investigator that she had entrusted her money to Sami; she was "visibly shaken" when she learned that her bills were not being paid.

During the APS visit, Sami admitted that he had spent all but $65,000 of Claryce's money.[5] He also acknowledged that, although he had spent some of the money on Claryce's needs, a substantial amount of it was not accounted for. Sami asserted that he would pay back every penny of Claryce's money. He made the same promise to Claryce and repeated it to APS investigators the following day. Sami did eventually pay the cardiologist's bill.

During another visit in late July 2005, Sami told an APS investigator that Mona did not have anything to do with taking Claryce's money, although she was aware that Sami had taken it. Sami also asked the investigator whether "this would just go away" if he repaid all of the money. The investigator asked Sami whether he had over $400,000 available to give Claryce. Sami said that he did have the money, but it was tied up with Mona." Sami told the investigator that he had an appointment with a divorce lawyer the following week and hoped to get a large settlement from the divorce, which

---

[5] Sami said that the $65,000 was in a Wells Fargo account that he and Mona held jointly, not an account in Claryce's name.

he could use to pay back Claryce. The investigator remarked that Claryce needed the money immediately so she could take care of herself.

In conjunction with its elder-abuse investigation, APS sent Sami a letter asking him to bring all financial records related to Claryce's inheritance to a meeting scheduled for late August 2005. APS also sent a letter to Mona asking her to cooperate in providing those financial records. A few days before the date set for the meeting, Sami's attorney sent APS a letter stating that Sami would not attend. Within a week, Sami and Mona filed a joint petition for divorce, and a stipulated judgment of dissolution was entered shortly thereafter.

In the divorce, Mona received the three houses that had been deeded to her in 2003, which had a total appraised value exceeding $1 million, and bank accounts that held several hundred thousand dollars. Mona owned the houses outright; there was "no debt against those properties." Sami received a Dodge Intrepid that he valued at about $20,000, the Wells Fargo bank account that held the money left over from Claryce's inheritance, and unspecified amounts of money held in two other bank accounts. Sami testified in his deposition that Mona got the majority of property in the divorce "to protect the assets" from "any encumbrance on [his] part," because he handled money very badly. Sami acknowledged that he had known that plaintiff was upset about how he was handling Claryce's finances; he also admitted that he had known "it was possible" that lawyers might get involved. Sami denied, however, that his knowledge of plaintiff's concerns contributed to his decision to transfer assets to Mona in their divorce.

Claryce died a few months after Sami and Mona divorced. Plaintiff, acting in her capacity as personal representative of Claryce's estate, subsequently initiated this financial elder-abuse litigation.

Plaintiff first claimed that Sami and Mona both had financially abused Claryce in violation of ORS 124.110. Those elder-abuse claims went to trial, and the jury determined that Sami had wrongfully taken or appropriated

$265,000 of Claryce's money or property. The jury rejected plaintiff's claim that Mona had directly abused Claryce, but it found that she had "permit[ted] Sami El-Tobgy to engage in financial elder abuse knowingly or fail[ed] to act under circumstances in which a reasonable person should have known of financial abuse," making her liable under ORS 124.100(5). The jury awarded plaintiff $125,000 in damages resulting from what Mona calls that "bystander liability." The trial court trebled the elder-abuse damages as required by ORS 124.100(2)(a). Accordingly, the general judgment awards plaintiff $795,000 against Sami and $375,000 against Mona for their violations of the elder-abuse statutes, plus prejudgment interest on the nontrebled amounts.

After the jury returned its verdicts on the elder-abuse claims, the trial court considered plaintiff's second claim, in which she sought relief under the Uniform Fraudulent Transfer Act (UFTA). Plaintiff explained that she did not allege additional damages under the UFTA; rather, she viewed that claim as providing a means by which she could recover the damages associated with the elder-abuse claims. The trial court found that Mona and Sami had assets totaling about $1.6 million before their divorce, most of which had gone to Mona under the stipulated dissolution judgment. The court also found that Sami had transferred about $600,000 of those assets to Mona "with a specific intent to defraud the potential creditors around him" and determined that the "appropriate remedy for that fraudulent conveyance was entry of judgment in favor of Plaintiff and against Mona El-Tobgy in the amount of $600,000."

The trial court entered a general judgment reflecting the verdicts and plaintiff's acknowledgment that (1) Mona's elder-abuse liability was essentially derivative of Sami's and (2) the UFTA judgment should void the fraudulent transfer of assets to Mona only to the extent necessary to satisfy defendants' elder-abuse liability to plaintiff. Accordingly, the general judgment provides that—"[n]otwithstanding the multiple money awards entered against Defendants"—plaintiff is not "entitled to collect more than the total sum of $795,000"

plus interest, costs, and attorney fees. A supplemental judgment awards plaintiff nearly $110,000 in attorney fees and costs.[6]

Mona initially raised six assignments of error on appeal, but she abandoned the second assignment of error in her reply brief and we reject most of her remaining arguments without discussion. We write primarily to address Mona's contention that the trial court erred in holding that Sami fraudulently transferred assets to her in their divorce. In that regard, Mona first focuses on the trial court's finding that only Sami, not Mona, acted with fraudulent intent when they stipulated to the division of marital assets. According to Mona, that finding equates to a determination that she and Sami divorced in good faith, *i.e.*, that the divorce itself "was not a sham." In light of that determination, Mona argues, the trial court could not properly conclude that the concomitant allocation of assets involved a fraudulent transfer. In other words, Mona argues that—as a matter of law—the transfer of assets during a divorce can violate the UFTA only if the divorce itself is fraudulent. We disagree.

A marriage-dissolution judgment may be collaterally attacked on the basis of extrinsic fraud. *Greeninger v. Cromwell*, 140 Or App 241, 246-47, 915 P2d 479, *rev den*, 323 Or 690 (1996). "Extrinsic fraud consists of collateral acts not involved in the fact finder's consideration of the merits of the case" that resulted in the challenged judgment. *Johnson v. Johnson*, 302 Or 382, 384, 730 P2d 1221 (1986). Thus, a creditor may collaterally challenge a dissolution judgment on the ground that it resulted in a fraudulent transfer of assets from a debtor to his or her former spouse. *Greeninger*, 140 Or App at 246-47. When that type of attack succeeds, however, it "does not necessarily affect the other portions of the dissolution judgment." *Id.* at 247 n 4. For example, the relief available under the UFTA may be limited to " '[a]voidance of the transfer or obligation to the extent necessary to satisfy the

---

[6] Mona filed cross-claims against Sami, and the judgment reflects that Sami "conceded his liability to [Mona] on her cross-claims for common-law indemnity and contribution." The court entered judgment in favor of Mona and against Sami for the total amount that Mona was required to pay plaintiff, plus interest, less any amounts that Sami paid plaintiff directly. Sami's liability to Mona is not at issue in this appeal.

creditor's claim.' " *Id.* (quoting ORS 95.260(1)(a)). The collateral attack need not affect—and perhaps never would affect—the portion of the challenged judgment that dissolved the marriage itself.

Because that type of collateral attack voids only a fraudulent asset transfer, not the dissolution of the marriage, the UFTA claim can proceed without regard to whether the *divorce* was fraudulent or a sham. A couple may legitimately wish to dissolve their marriage, yet still act unlawfully by agreeing to divide their assets in a way that shields those assets from one spouse's creditors. The couple's mutual desire to divorce does not entitle either spouse to engage in that kind of fraudulent activity. Thus, even assuming that the trial court implicitly found that Sami and Mona's divorce was not itself a sham, the trial court still could properly find that Sami acted with fraudulent intent when he agreed to transfer the bulk of the marital property to Mona.

Mona also argues that, as a matter of law, the asset transfer did not violate ORS 95.230(1). That UFTA provision focuses on the "actual intent" of a person who is alleged to have fraudulently transferred property:

"A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

"(a)   With *actual intent* to hinder, delay, or defraud any creditor of the debtor[.]"

ORS 95.230(1)(a) (emphasis added). Mona contends that, because "no claim had been made" when she and Sami divorced,[7] that divorce "could not have been done with 'actual intent' to hinder or defraud either Claryce or her estate in collecting on a potential future judgment for financial elder abuse."[8]

---

[7] As explained below, we understand Mona's assertion that no claim had been "made" at the time of the divorce to refer to the absence of evidence that anybody either had sued Sami to recover Claryce's money at that time or had expressed any intention to do so.

[8] In addition to claiming that the asset transfer was fraudulent under ORS 95.230(1)(a), plaintiff also contended that it was fraudulent under ORS 95.240(1).

The precise nature of Mona's argument is important to our analysis, as are the pertinent statutory definitions. For purposes of ORS 95.230(1)(a), a "claim" is defined in terms of a legal right to be paid:

> " 'Claim' means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured."

ORS 95.200(3).

Mona does not challenge the sufficiency of the evidence that Sami owed Claryce money when he and Mona divorced. To the contrary, Mona concedes that she is bound by the jury's determination that Sami wrongfully took Claryce's money, and our *de novo* review of the record confirms that Sami appropriated that money before his marriage to Mona was dissolved.[9] Consequently, Claryce had a "claim" against Sami at that time.

Nor does Mona appear to challenge the sufficiency of the evidence that Sami acted with the intent to avoid repaying Claryce (or her estate) when he agreed to transfer most of the marital property to Mona.[10] Instead, Mona frames her argument as presenting solely a *legal* question: whether a person who transfers property is capable of forming the requisite wrongful intent, for purposes of ORS 95.230(1)(a), even

---

Because we affirm the trial court's determination that the asset transfer was fraudulent under the former statute, we do not address whether it also violated the latter provision.

[9] In UFTA appeals, we historically have reviewed "legal issues for errors of law and factual determinations *de novo*." *Preferred Funding, Inc. v. Jackson*, 185 Or App 693, 695, 61 P3d 939 (2003). Although a 2009 amendment to ORS 19.415(3) limits the circumstances in which we will undertake *de novo* review in equitable cases, that amendment does not apply to this case, in which Mona filed her notice of appeal before June 4, 2009. *See* Or Laws 2009, ch 231, §§ 2, 3. Accordingly, to the limited extent that Mona's appeal requires us to review any of the trial court's implicit or explicit factual findings, we review *de novo* the record made in the trial court.

[10] Even if Mona had challenged the sufficiency of the evidence, we would have reached the same result. We have reviewed the entire record of the case, keeping in mind the equitable nature of plaintiff's UFTA claim. Had Mona asked us to consider whether plaintiff adequately proved that Sami acted with the requisite wrongful intent, we would have found, on *de novo* review, that Sami acted with "actual intent" to avoid repaying his debt to Claryce when he stipulated to a dissolution judgment that awarded the bulk of the marital property to Mona.

if no claim has "been *made*" against the transferor by the time the transfer occurs. (Emphasis added.) In posing that question, Mona does not explain what she means when she argues that the transferor can develop a fraudulent intent only if a claim already has "been made." However, her argument is based on two factual contentions: first, that "Claryce would never have authorized or allowed Sami to be *sued* for financial elder abuse" and, second, that, at the time of the divorce, "Sami had no reason to believe that [plaintiff] would *file this case* after [Claryce's] death and accuse him of financial elder abuse." (Emphases added.) We infer from those assertions that, in noting that no claim had "been made," Mona refers to the undisputed fact that neither Claryce nor plaintiff had initiated litigation against Sami before the divorce, and neither apparently had expressed any plan to do so.

Thus, Mona appears to argue that—as a matter of law—a person who transfers property cannot form "actual intent" to defraud a creditor unless and until the person is aware that the creditor plans to sue him. We disagree. As we explain below, a person's transfer of property can be fraudulent under ORS 95.230(1)(a) if the person makes the transfer with the intent to defraud any creditor, regardless of whether the creditor planned to sue the transferor or the transferor believed that such litigation would occur.

To establish that a property transfer "is fraudulent as to a creditor" under ORS 95.230(1)(a), a plaintiff must prove (1) that a "debtor" made the transfer; (2) that the creditor has a "claim" that "arose before or after the transfer was made"; and (3) that the debtor made the transfer "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor[.]" The terms "creditor" and "debtor" are defined by cross-reference. A creditor is "a person who has a claim against a debtor" and a debtor is "a person against whom a creditor has a claim." ORS 95.200(4), (6). And, as noted, a "claim" is defined in terms of a legal right to be paid, not in terms of whether litigation or other formal proceedings have been—or even will be—initiated. ORS 95.200(3).

Thus, to have the requisite wrongful intent, a person who transfers property need only intend "to hinder, delay or

defraud" any person who has "a right to payment" from him. The debtor need not know that the creditor plans to *pursue* that right to payment. Indeed, the statute does not require that the creditor even have such a plan. Mona's contrary argument contradicts the plain text of ORS 95.230(1)(a).

Another UFTA provision, ORS 95.230(2)(d), further undermines Mona's contention that a debtor can have wrongful "actual intent" only if a claim already has "been made" against him. That statute explains that whether "the debtor was sued or threatened with suit" before the transfer occurred is just one of many factors a court may consider in determining whether a debtor acted with "actual intent" to defraud a creditor when he or she transferred property. If the threat of a lawsuit were determinative, as Mona argues, it would not be listed among the factors to which "consideration may be given." ORS 95.230(2).

Application of the pertinent statutory provisions is straightforward in this case. The trial court found that Sami transferred property to Mona with specific intent to protect those assets from Claryce or her estate. Having made that factual finding, the court ruled correctly when it concluded that the asset transfer was fraudulent. The lack of evidence that anybody had expressed plans to sue Sami for the money he owed Claryce is irrelevant.

Mona also challenges a portion of the trial court's award of attorney fees to plaintiff, which she characterizes as having been incurred in a "separate case." Indeed, plaintiff did file two complaints related to Sami's financial abuse of Claryce. Plaintiff did not timely serve the first complaint on the Attorney General, as required by ORS 124.100(6), and the trial court dismissed the complaint on that basis. Plaintiff appealed, but later voluntarily dismissed that appeal and filed a new complaint: the one that led to the judgments that are now before us on appeal. After prevailing at trial, plaintiff petitioned for attorney fees based on the time that her lawyers worked on both cases. Mona objected, arguing to the trial court, as she does on appeal, that the "[r]easonable attorney fees" to which a prevailing party is entitled "cannot be fees incurred in an entirely separate case." In response, plaintiff argued that she was entitled to fees for the work her

lawyers did on the first case because most of that work "was not duplicated" in the second case and the work "aided in preparation and presentation of Plaintiff's claims at trial." Specifically, plaintiff noted that her attorneys had interviewed witnesses, deposed both defendants, and reviewed many documents before filing the complaint in the second case. She asserted that "[t]he evidence gathered and legal work done prior to [the date on which she filed the second complaint] were reasonably related to the prosecution of [the second] case and were, in fact, essential to the result."

The trial court agreed with plaintiff, and so do we. "Statutes that authorize an award of attorney fees to a party who succeeds or prevails in a proceeding authorize an award for the fees reasonably incurred to achieve the success that the party actually achieved." *Freedland v. Trebes*, 162 Or App 374, 378, 986 P2d 630 (1999). A plaintiff's attorney often must perform a significant amount of work before filing a complaint that will withstand immediate challenge; those efforts may include factual investigations, legal research, and careful drafting. Consequently, when a statute authorizes a trial court to award attorney fees to a plaintiff who prevailed in litigation, the court is not limited to awarding only those fees incurred after the plaintiff filed her complaint. Rather, the court also may award fees associated with attorneys' reasonable prefiling activities.

Moreover, a plaintiff does not lose the right to recover fees for those prefiling endeavors simply because they were associated with filing an initial complaint that turns out, for whatever reason, to have been ineffective. What matters is whether the work the attorneys did in conjunction with preparing, filing, and litigating that first complaint was "reasonably incurred to achieve the success" that the plaintiff eventually enjoyed in the litigation that followed the filing of a subsequent complaint. In that respect, the circumstances here—where plaintiff's first complaint was dismissed but she prevailed on the second—are somewhat analogous to a situation in which a plaintiff prevails only on some of several claims that go to trial. In that latter situation, the plaintiff may recover the fees reasonably incurred in association with the claims on which she prevailed, including time spent on the *other* claims if "there are common issues

among the claims such that 'it would have taken roughly the same amount of time to litigate a case in which the successful claim was the sole claim as it took to litigate the case in which it was one among several claims[.]' " *Rogers v. RGIS, LLP*, 229 Or App 580, 587 n 7, 213 P3d 583, *adh'd to as modified on recons*, 232 Or App 433, 222 P3d 710 (2009), *rev den*, 348 Or 291 (2010) (quoting *Freedland*, 162 Or App at 379). In such a case, the issue is not whether the plaintiff may be entitled to recover fees associated with the unsuccessful claims—she may—but whether the amount of those fees is reasonable. *Cf. Bennett v. Baugh*, 164 Or App 243, 247-48, 990 P2d 917 (1999), *rev den*, 330 Or 252 (2000) (stating principle in relation to prevailing defendants' work on both successful and unsuccessful affirmative defenses). Here, too, plaintiff is entitled to recover fees for all of the work her attorneys reasonably performed in helping her prevail, even though they did some of that work in association with a complaint that was dismissed, but that involved issues in common with those raised by the second, successful complaint.

The trial court performed the correct analysis in this case: it reviewed each of the time entries in plaintiff's detailed attorney-fee petition to determine which of the fees incurred before the second complaint was filed "were reasonably related to the prosecution of the action and the result obtained" and which were not. Based on that evaluation, the court awarded most, but not all, of the attorney fees that plaintiff sought to recover in association with the work her attorneys performed before they filed the second complaint. We reject Mona's argument that plaintiff is not entitled to those fees.

On cross-appeal, plaintiff challenges the attorney-fee award from the other direction, arguing that she is entitled to recover *all* of the fees she incurred before the second complaint was filed. Plaintiff argues, primarily, that the trial court abused its discretion by assessing the reasonableness of that portion of plaintiff's fee request "line-by-line" without giving plaintiff an opportunity "to explain or defend any disallowed entries * * *." Plaintiff also contends that the trial court lacked authority to disallow fees associated with specific time entries because Mona had not challenged particular time entries in her written objection to the fee petition.

We reject both of those arguments.[11] First, plaintiff's contention that the court lacked authority to reject certain requested fees on a "line-by-line" basis is not preserved for our review. It is true, as plaintiff contends, that Mona did not make entry-specific challenges in her written objection to the fee petition. But Mona did argue along those lines at the fee-petition hearing. For example, she asserted that, if the court awarded any fees for the time that plaintiff's attorneys had worked before filing the second complaint, the court should disallow fees for legal work that was "clearly duplicated" in the second case. After Mona made that argument, the court stated that it viewed some, but not all, of the time that plaintiff's attorneys had spent on "Case No. 1" as being "reasonably related to Case No. 2," and the court later explained that it had determined, entry by entry, which of those fees to award. Plaintiff did not object; indeed, she never suggested to the trial court that it lacked authority to review the requested fees on an entry-by-entry basis simply because Mona had not made entry-specific challenges in her written objection to the fee petition. In short, plaintiff did not preserve that claim of error in the trial court, and we do not consider it on appeal.

We also reject plaintiff's argument that she lacked any opportunity "to explain or defend any disallowed entries." As noted above, plaintiff explained at the fee-petition hearing that much of her lawyers' work on the first case had been useful in bringing the second case to trial; she also pointed out that her lawyers' work on the second case had not duplicated their efforts in the initial litigation. The trial court then went through plaintiff's fee petition line by line, indicating, with respect to legal work done before the second complaint was filed, which time entries the court had determined were related to "Case No. 2" and which were not. At the end of the hearing, the court handed the parties a marked-up copy of the fee petition showing which fees it had allowed and which it had rejected. Plaintiff did not object to any of those line-specific decisions; nor did she request additional time to review them and provide further justification

---

[11] We also reject, without discussion, the additional arguments that plaintiff raised in her reply brief on cross-appeal.

for the fees that the court had disallowed. Accordingly, we reject plaintiff's contention that the trial court erred by not granting her an adequate opportunity to challenge its rulings.

Affirmed on appeal and cross-appeal.