Argued and submitted November 7, 2013, affirmed October 1, 2014, petition for review denied January 15, 2015 (356 Or 685)

Kenneth R. NORRIS,
*Plaintiff-Respondent,*

*v.*

R & T MANUFACTURING, LLC,
an Oregon limited liability company,
*Defendant-Appellant.*

Multnomah County Circuit Court
101116202; A150859

338 P3d 150

Helen C. Tompkins argued the cause and filed the briefs for appellant.

Conrad E. Yunker argued the cause for respondent. With him on the brief were Conrad E. Yunker, P.C., Gary Abbott Parks and Northwest WageLaw, LLC.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and De Muniz, Senior Judge.

HADLOCK, J.

**HADLOCK, J.**

Defendant R & T Manufacturing, LLC (R & T), a limited liability company organized under ORS chapter 63, appeals from a general judgment for plaintiff in this action for damages under the Uniform Fraudulent Transfers Act (UFTA), ORS 95.200 to 95.310. The trial court found that R & T's principals and only members, Robert and Thomas Laney, dissolved Action Accessories, LLC (Action) and transferred its business and assets to R & T for the purpose of avoiding a judgment that Action owed to plaintiff. As a remedy, the court imposed a judgment against R & T in the amount of plaintiff's outstanding claim against Action. On appeal, R & T contends for several reasons that the trial court erred. We affirm.

## I. BACKGROUND

A. *Plaintiff's suit against Action, the dissolution of that company, and the formation of R & T.*

We summarize the facts as set forth in the trial court's findings, as supplemented by the largely undisputed facts in the record, including the trial testimony. Action, doing business as "Action Accessories," manufactured truck accessories for pickup trucks, including hitch caps, trailer hitch parts, steps, mud flaps, and bike and ski racks. Thomas Laney testified that Action was responsive to the market and could change its product line depending "on what might be hot at the time in that industry or what the Chinese might not have been building." Plaintiff worked for Action until his employment terminated in July 2007.

In February 2009, plaintiff filed a claim against Action, and Thomas and Robert Laney personally, for unpaid wages, penalties, and attorney fees. ORS 652.610(3); ORS 652.150. On December 16, 2009, plaintiff prevailed on his claims in court-annexed arbitration. A week later (and as will be further discussed), the Laneys dissolved Action and formed R & T. The Laneys and Action appealed the arbitration award to the circuit court. The circuit court dismissed

the Laneys as defendants,[1] but Action (which by that time had been dissolved) did not put on a defense because it was not represented by counsel. In May 2010, plaintiff obtained a default judgment for damages against Action in the amount of $3,937, and, in July 2010, the court entered a supplemental judgment for attorney fees and costs in the amount of $59,725. Plaintiff appealed the judgment for damages, which we affirmed without opinion. *Norris v. Laney*, 247 Or App 353, 271 P3d 154 (2011).

Three days after the supplemental judgment was entered, plaintiff sought to garnish the amount of his judgment from Action's bank account, but Key Bank reported that there were "no funds." In the meantime, as noted, the Laneys had dissolved Action in December 2009 and formed R & T, which had begun doing business immediately upon its formation, in the same location, under the same management, with the same equipment and personnel, but under, as Thomas Laney testified, a different business plan. Indeed, R & T made its first sale five days after the arbitrator's award in December 2009.

At trial, Thomas Laney described the Laneys' position on why they had formed a new business entity. Thomas asserted that Action "could not make a profit. The company was losing money, and [he and Robert] wanted to go in a different direction. And this whole change has only to do with that." Laney explained that R & T has a different and more competitive business model than Action. In contrast to Action, which had manufactured its own line of finished consumer products, R & T is a "machine shop," or a "job shop." It does not have its own product line; rather, it fabricates component parts or custom-finished products for its customers.

Thomas explained that the name change to R & T Manufacturing was a part of the Laneys' marketing strategy. Thomas testified that, unlike the name "Action Accessories," the company name "R & T Manufacturing"

---

[1] Action was a limited liability company. Under ORS 63.165(1), "[a] member or manager [of a limited liability company] is not personally liable for a debt, obligation or liability of the limited liability company solely by reason of being or acting as a member or manager."

signifies to prospective customers like Boeing that R & T is in the business of custom manufacturing or fabricating rather than merely carrying its own line of products. Thomas also testified that Action had poor credit and that part of the reason for dissolving Action and creating R & T was to permit R & T to build new credit so that it could acquire new machinery.

## B. *The asset transfer*

Action had operated in part based on a $50,000 line of credit that it had obtained from Key Bank, which held a perfected security interest on all of Action's assets, including its inventory, equipment, goodwill, and accounts receivable. After Action dissolved in December 2009, it transferred control of its assets to R & T, but continued to own all of the manufacturing equipment for more than one year, subject to Key Bank's security interest.[2] In February 2011, R & T purchased all of Action's tangible assets, with the exception of its receivables, at an estimated value of $38,805 and assumed Action's debt of $49,799 to Key Bank.

R & T also acquired additional manufacturing equipment, at no cost, from the Laneys' father, who worked for the company. Robert and Thomas began doing more fabricating work because they could provide skilled labor for R & T's new products. But otherwise, much about R & T's business remained the same as Action's: R & T's capital structure and business practices are the same as Action's. R & T carries on business with many of the same suppliers, the same employees and much of the same equipment, from the same leased space, using the same telephone and fax numbers, the same credit card machine, and under the same assumed business name, "Action Accessories."

---

[2] Thomas testified that R & T leased the equipment from Action, but the record includes no evidence of a written lease. We note that ORS 63.625 permits a dissolved limited liability company to continue to own its assets after dissolution and during the winding up of the company. Moreover, the dissolution of a limited liability company does not effect a transfer of the company's property, ORS 63.637(2)(a), and a dissolved limited liability company continues its existence for purpose of winding up and liquidating its business, ORS 63.637(1), including disposing of "known claims" against it. ORS 63.641.

## C.  *The UFTA and this litigation*

As context for our discussion of the trial-court litigation in this case, we briefly address the legal context for the issues raised on appeal. ORS 95.230(1) describes circumstances in which a transfer of assets can give rise to a fraudulent transfer, "whether the creditor's claim arose before or after the transfer was made[.]" The statute provides, in relevant part:

"A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

"(a)   With actual intent to hinder, delay, or defraud any creditor of the debtor[.]"[3]

To establish a fraudulent transfer under that statute, a plaintiff must prove, by a preponderance of the evidence, that the debtor made a "transfer," that the plaintiff has a claim as a creditor that arose before or after the transfer was made, and that the transfer was made "with actual intent to hinder, delay, or defraud" the plaintiff. *Fadel v. El-Tobgy*, 245 Or App 696, 707, 264 P3d 150 (2011), *rev den*, 351 Or 675 (2012) (describing elements); *Preferred Funding, Inc. v. Jackson*, 185 Or App 693, 699, 61 P3d 939 (2003); *Morris v. Nance*, 132 Or App 216, 223, 888 P2d 571 (1994), *rev den*, 321 Or 340 (1995) (stating preponderance of evidence standard). ORS 95.200(12) defines a "transfer" in broad terms as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset[.]" An "asset," in turn, is defined as "property of a debtor," but does not include "[p]roperty to the extent that it is encumbered by a valid lien." ORS 95.200(2). Finally, "property" is defined as "anything that may be the subject of ownership." ORS 95.200(10).

---

[3] ORS 95.240 describes additional circumstances that constitute a fraudulent transfer "as to a creditor whose claim arose before the transfer[.]" Plaintiff pleaded counts under both ORS 95.230(1)(a) and ORS 95.240, but the trial court based its judgment only on ORS 95.230(1)(a), and plaintiff does not challenge that ruling. Accordingly, we confine our discussion to the legal context for a claim under ORS 95.230(1)(a).

In determining whether a transfer was made with "actual intent to hinder, delay, or defraud," as that phrase is used in ORS 95.230(1)(a), the court may consider, among other factors, those set out in ORS 95.230(2), which courts have described as "badges of fraud." *See Morris*, 132 Or App at 219 n 4 (explaining historical origins of "badges of fraud"). The statutory factors include whether:

"(a)   The transfer or obligation was to an insider;

"(b)   The debtor had retained possession or control of the property transferred after the transfer;

"(c)   The transfer or obligation was disclosed or concealed;     .

"(d)   Before the transfer was made or obligation was incurred, the debtor was sued or threatened with suit;

"(e)   The transfer was of substantially all the debtor's assets;

"(f)   The debtor had absconded;

"(g)   The debtor had removed or concealed assets;

"(h)   The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

"(i)   The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

"(j)   The transfer had occurred shortly before or shortly after a substantial debt was incurred; and

"(k)   The debtor had transferred the essential assets of the business to a lienor who had transferred the assets to an insider of the debtor."

ORS 95.230(2). However, a transfer "is not voidable under ORS 95.230(1)(a) as against a person who took in good faith and for a reasonably equivalent value[.]" ORS 95.270(1).

Plaintiff's first amended complaint included a UFTA claim, in which plaintiff alleged that the transfer of assets from Action to R & T was fraudulent under ORS 95.230(1)(a) because it was made "with actual intent to hinder, delay, and defraud" plaintiff's collection of his judgment

against Action.[4] The case was tried to the court. Plaintiff put on evidence directed to proving that R & T either acquired through purchase or otherwise took control of all of Action's business, including its assets and obligations, with the exception of Action's debt to plaintiff. Plaintiff contended that the evidence showed that the Laneys had no legitimate business reason to dissolve Action and form R & T, except to avoid plaintiff's judgment. Plaintiff's position was, in essence, that the change in business entity, along with R & T's assumption of control of Action's business, effected a fraudulent transfer of *all* of Action's assets to R & T.

R & T took the position that the Laneys had good-faith business reasons for dissolving Action and creating R & T that had nothing to do with avoiding plaintiff's judgment. Further, R & T asserted, the only business assets that Action transferred and that R & T acquired were its equipment and inventory, for which it paid "reasonably equivalent value" through the assumption of Action's debt to Key Bank. Moreover, R & T argued, any assets transferred were fully encumbered by Key Bank's security interest and for that reason could not form the basis for a fraudulent-transfer claim.

The trial court made extensive findings that reflected its rejection of R & T's explanation for the change in business entity and its acceptance of plaintiff's position. The court found that, although Thomas testified that he and Robert had decided to dissolve Action and form R & T in order to change their business model and become more competitive, there was "no reason for Action to change its business entity to begin targeting a new line of business or to buy new or different equipment." Thus, the court determined, "[t]he only

---

[4] Plaintiff's first amended complaint alleged five claims. In the first three claims, plaintiff sought to hold R & T liable either as a successor employer of Action, for Action's alleged violations of Oregon's wage and hour laws, ORS 652.610; ORS 652.615, for payment of the judgment against Action, and for attorney fees. ORS 652.200. In his fourth claim, plaintiff asserted that R & T is a "mere continuation" of Action and, citing ORS 652.310, asserted that he is entitled to a declaration awarding him damages in the amount of the judgment against Action, as well as his costs and attorney fees. In his fifth claim—the one that we address in this opinion—plaintiff asserted that Action's dissolution and R & T's creation effected a fraudulent transfer in violation of the UFTA. The trial court granted R & T's motion to dismiss the first four claims and entered a limited judgment to that effect. Plaintiff did not appeal the limited judgment.

significant advantage derived from abandoning the Action LLC and forming the new R & T LLC was the elimination of the obligation to [plaintiff]."[5]

The trial court also rejected R & T's assertion that the assets it acquired from Action had a negative value because of Key Bank's security interest. It found that R & T

---

[5] The trial court explained its skepticism:

"THE COURT: *** I heard your client's explanation ***—maybe you can explain it better.

"[R & T's COUNSEL]: Okay.

"THE COURT: *** So they want to get in a new business space. They want to move away from truck accessories to more specialized products. They want to stop competing with the Chinese.

"[R & T's COUNSEL]: Yes.

"THE COURT: Why can't they do that simply as the same LLC? There's no reason to change business entities. Businesses change their focus all the time without changing—going through the difficult process of reorganizing their entity. They have the same capital structure; they have the same debt; they have the same phone number; they have the same location. Everything remains the same—

"[R & T's COUNSEL]: Right.

"THE COURT: —except for the name, which could have been done with a simple registration of a DBA or even changing the name of the LLC, which can be done with a small fee.

"[R & T's COUNSEL]: Right.

"THE COURT: I cannot, sitting here, frankly—and I'll—maybe you can convince me otherwise.

"[R & T's COUNSEL]: Sure.

"THE COURT: I cannot conceive of any reason for this change in business formation except to get around this debt."

And again:

"THE COURT: What purpose did changing entities serve—

"[R & T's COUNSEL]: Because—

"THE COURT: —other than avoiding [plaintiff's judgment]?

"[R & T's COUNSEL]: Because R & T Manufacturing was a job shop, and it took on a different business model.

"THE COURT: People change business models every day without changing their business entity.

"[R & T's COUNSEL]: And other people open up new businesses every day to start new companies that have different business models.

"THE COURT: But they usually don't operate with the exact same equipment at the same location with the same phone number and the—

"[R & T's COUNSEL]: No

"THE COURT: —same website."

had acquired not only Action's tangible assets (which R & T's witness valued at $38,805) but had actually acquired the entirety of Action's business, including Action's relationships with its suppliers and customers, Action's brand name, its skilled employees, and its business goodwill. The court found that those intangible assets themselves had value—value that R & T acquired when the assets were transferred from Action. In making that determination, the court cited evidence that in 2009, Action had income of $46,781, after payment of expenses and guaranteed payments of $100,000 to partners. The court also observed that, after its formation, R & T continued to earn sufficient income to pay its expenses, and the court reasoned that R & T's ability to generate that level of income reflected that the business had a value exceeding that of the tangible assets alone:

> "The book value or value of tangible assets is only one factor to consider in valuing a business. A much more important consideration is the ability of the business to generate income for its owners. Here, the evidence established that Action was generating substantial income for its owners. Thomas Laney testified that R & T essentially picked up where Action left off, and continues to generate substantial income for its owners.

> "I conclude that the value of the assets purchased by R & T was in excess of $90,000. This value is confirmed by applying a very conservative 33% capital rate (a 3 times multiple) to Action's 2009 reported taxable income of $46,781 (after deducting substantial payments to partners, interest and depreciation), which leads to a value of $140,343. From this amount, the outstanding debt of Action that was assumed by R & T should be subtracted. This value is also confirmed by the fact that in 2009, Action generated $46,781 in pretax income, plus $61,768 in guaranteed payments to its owners, and $40,000 in cash distributions to its owners."

As we understand the trial court's reasoning, based on evidence of Action's income and distributions for 2009 and evidence that R & T continued to earn income sufficient to pay its expenses, including salaries to Thomas and Robert Laney, the court conservatively estimated that the value of the business transferred from Action to R & T exceeded Key Bank's security interest on Action's debt of $49,499

and was approximately $90,000. Accordingly, the court concluded, R & T had "substantially undervalued" the assets it acquired from Action, "as it placed no value on Action's income producing capability, which derived from Action's business goodwill, its relationship with skilled employees, suppliers and customers and its brand recognition, all of which were effectively transferred to R & T."

The trial court then considered the factors described in ORS 95.230(2) to determine whether Action transferred its assets to R & T "[w]ith actual intent to hinder, delay, or defraud" its creditors, including plaintiff, in a way that would make the transfer fraudulent under ORS 95.230(1)(a). The court found that the transfer was between insiders (ORS 95.230(2)(a)); that it effected a transfer of all of Action's assets that had any value (ORS 95.230(2)(e)); that the transfer occurred soon after Action had received an underlying adverse ruling in plaintiff's underlying lawsuit (ORS 95.230(2)(d), (j)); that the transfer made Action insolvent and unable to answer for plaintiff's judgment (ORS 95.230(2)(i)); and that the transaction substantially undervalued the assets purchased by R & T (ORS 95.230(2)(h)). The court concluded that the transfer of assets from Action to R & T was a fraudulent transfer under ORS 95.230(1)(a), made for the purpose of avoiding the obligation to plaintiff that was subsequently reduced to judgment.

As a remedy, the court ordered that the judgment debt owed by Action to plaintiff be "applied to R & T." Thus, the court awarded plaintiff a judgment against R & T in the amount of plaintiff's outstanding judgments against Action.

## II. ANALYSIS

On appeal, R & T asserts that the trial court erred in entering judgment for plaintiff for several reasons. First, R & T argues that UFTA does not apply to the challenged transaction, because the only property transferred to R & T—Action's equipment and inventory—was not an "asset" under ORS 95.230(2)(a), as it was fully encumbered by Key Bank's security interest. Second, citing ORS 95.270(1), R & T contends that the transfer cannot be avoided "as against" R & T because it paid "a reasonably equivalent value" for the transferred property. Third, R & T argues that the remedy

imposed by the trial court was excessive and not authorized by ORS 95.260 and ORS 95.270(2). Fourth, noting that the trial court had previously dismissed four of plaintiff's claims that were based on a "continuation" theory—and relying on "law of the case" principles—R & T asserts that the court erroneously relied on that same "continuation" theory as a basis for its judgment for plaintiff. Finally, R & T argues that certain of the trial court's findings are not supported by legally sufficient evidence. We address each of those arguments below.

Formerly, we reviewed UFTA cases *de novo. Morris*, 132 Or App at 218. Although we retain discretion to apply that standard of review, ORS 19.415(3)(b), we no longer do so as a matter of course. Neither party has requested that we review *de novo* and, in any event, this is not an exceptional case in which we would exercise our discretion to do so. *See* ORAP 5.40(8)(c). Accordingly, we review the trial court's legal conclusions for errors of law and its findings of fact for legally sufficient evidence.

As noted, R & T first contends that the trial court erred in entering judgment for plaintiff because the record shows that the $38,805 worth of equipment and inventory that Action transferred to R & T were fully encumbered by Key Bank's security interest and, therefore, were not "assets" subject to UFTA. *See* ORS 95.200.[6] Plaintiff contends that R & T did not preserve that argument for appeal because it never argued in the trial court that encumbered assets are not "assets" within the meaning of the UFTA.

Plaintiff is correct that at trial R & T did not make the precise argument that it now raises. Although R & T contended that the equipment and inventory had zero value because they were fully encumbered, it did not argue to the trial court that a fully encumbered asset is not an "asset" for purposes of the UFTA. R & T contends that we can, nevertheless, address the argument for the first time on appeal based on our holding in *Kellstrom Bros. Painting v. Carriage*

---

[6] ORS 95.200(2) provides:

"'Asset' means property of a debtor but does not include:

"(a) Property to the extent that it is encumbered by a valid lien[.]"

*Works, Inc.*, 117 Or App 276, 844 P3d 221, (1992), *rev den*, 317 Or 162 (1993), in which we addressed precisely the same kind of UFTA "asset" argument even though it had not been raised in the trial court.

We need not decide whether, under *Kellstrom*, the question raised by R & T is one that we must address despite the lack of preservation, as we readily conclude that, in all events, the argument lacks merit. R & T's argument is limited and is based entirely on its contention that "[t]he only transfer attacked by plaintiff was the transfer of equipment and inventory." Thus, R & T argues only that, "because the equipment and inventory purchased by defendant was less than $49,799 [the amount of Key Bank's security interest,] there was no 'asset' transfer and the UFTA does not apply to this case."

The foundation on which that argument rests is contradicted by the trial court's factual findings. Plaintiff argued at trial that R & T acquired Action's entire *business*, not merely its tangible assets:

> "Essentially what's happened here is that R & T Manufacturing LLC is merely a new hat for an old business. The principals of Action Accessories, having received an adverse ruling in the arbitration in the Action Accessories case, decided to form a new corporation, a new company to strip off [plaintiff's] claim against Action Accessories and then go on and do business as usual otherwise."

Accordingly, plaintiff's trial evidence focused on the identity of operations of Action and R & T. And, in ruling for plaintiff, the trial court found that the transfer encompassed all of Action's business over which R & T had assumed control, including Action's intangible assets. The record supports that finding.

The record also supports the trial court's finding that the value of Action's business—including the intangible assets transferred to R & T—exceeded the amount of Key Bank's security interest. "[V]aluation is a fact-based analysis necessarily taken on a case-by-case basis." *Tofte and Tofte*, 134 Or App 449, 457 n 5, 895 P2d 1387 (1995). Although a trial court's valuation of a business asset most commonly includes consideration of expert testimony, *see*

*Salgado and Salgado,* 258 Or App 557, 310 P3d 731 (2013), that is not always the case. Unlike in *Salgado,* which we remanded to the trial court for reconsideration of business valuation because the trial court's valuation method was not supported by any evidence in the record, 258 Or App at 564, this is not a case in which no credible evidence supports the trial court's determination that the value of the transferred assets exceeded the amount of Key Bank's encumbrance. To the contrary, the trial court extensively questioned witnesses regarding the finances of Action and R & T and determined, based on all of the evidence presented at trial, that the value of the property transferred to R & T exceeded the amount of Key Bank's encumbrance. That evidence includes Action's 2009 federal income-tax return, showing Action had a "gross profit" of $325,818 that year, and, after payment of salaries and guaranteed payments to partners and other expenses and deductions, business income of $46,781 and net assets of $13,624. Laney testified that Action had other assets that were not transferred to R & T, including accounts receivable that Action continued to collect. In January 2010, Action received payments of $18,013.50 and, as of the time of trial in June 2011, still had receivables in the amount of $3,000.00 to $4,000.00. Laney testified that, after a few months of struggling, R & T was building up its business and was generating enough income to allow payment of expenses, including salaries to the partners. That evidence is sufficient to establish that the value of Action's business that was transferred to R & T, including the tangibles worth more than $38,000, exceeded Key Bank's $49,799 security interest. Thus, at least *some* of the transferred assets were "assets" for purposes of UFTA. *See* ORS 95.200(2)(a) (an "asset" does not include "[p]roperty *to the extent that* it is encumbered by a valid lien" (emphasis added)); *Oregon Account Systems, Inc. v. Greer,* 165 Or App 738, 745, 996 P2d 1025 (2000) ("[E]quity in excess of the amount of the encumbering lien(s) is an 'asset' under UFTA."). Accordingly, the trial court did not err by not *sua sponte* entering judgment for R & T on the ground that *no* UFTA asset had been transferred, as R & T contends.

R & T also argues that, even if plaintiff might otherwise have a UFTA claim, R & T paid "reasonably equivalent

value" for the assets it acquired from Action by assuming Action's obligation to Key Bank. Accordingly, R & T concludes, the asset transfer cannot be voided as against it. *See* ORS 95.270(1) ("A transfer or obligation is not voidable under ORS 95.230(1)(a) as against a person who took in good faith and for a reasonably equivalent value[.]"). Again, however, R & T's argument is premised entirely on the notion that it acquired *only* Action's tangible assets. As explained above, the trial court found otherwise and determined that the transferred assets, including Action's business and intangibles, exceeded Key Bank's lien. Because the record includes evidence supporting that finding, the trial court did not err in concluding that R & T had not paid "reasonably equivalent value" for Action's assets.

In its third assignment of error, R & T asserts that the remedy imposed by the trial court—a judgment against R & T for the full amount of plaintiff's judgment against Action—is excessive under ORS 95.260 and ORS 95.270, which describe a creditor's remedies for a fraudulent transfer. Under ORS 95.260, the available remedies include avoidance of the transfer, ORS 95.260(1)(a), or "[a]ny other relief the circumstances may require." Under ORS 95.270(2), a creditor who establishes a voidable transfer may recover judgment against the transferee "for the value of the asset transferred * * * or the amount necessary to satisfy the creditor's claim, whichever is less." ORS 95.270(2)(a), (b). R & T's argument that the trial court's remedy is excessive, like its other arguments, depends on its contention that the only assets transferred were tangible assets having a value less than Key Bank's security interest. We already have affirmed the trial court's rejection of that contention, and we therefore also reject R & T's third assignment of error.

In discussing the appropriate remedy and deciding to impose on R & T a judgment for the amount of plaintiff's judgment against Action, the trial court stated that "it is clear that R & T is simply a continuation of Action." In its fourth assignment of error, R & T contends that the trial court thereby violated the "law of the case" doctrine by adopting a "mere continuation" theory of liability under ORS 652.310, despite the court having earlier rejected that

theory in dismissing four of plaintiff's claims, which plaintiff had brought not under the UFTA, but under different statutes. We reject R & T's contention that the trial court's statement constituted an adoption of a "mere continuation" theory of liability. The trial court's letter opinion leaves no doubt that it based R & T's liability on a fraudulent-transfer theory under ORS 95.230(1)(a), not on a "mere continuation" theory under another statute. The court characterized R & T's operations as a "mere continuation" in its letter opinion only to explain why it entered judgment against R & T as the transferee of the asset; that characterization did not mean that the trial court was adopting a legal theory that it had previously rejected.

In its fifth assignment of error, R & T describes several findings for which it claims there is no evidentiary support, including the trial court's finding of "actual intent" and the finding as to the value of the assets transferred.[7] We have previously concluded that the evidence supports the trial court's finding of actual intent and also supports the finding that the value of the assets transferred exceeded Key Bank's security interest. Nonetheless, R & T asserts that the evidence does not support the trial court's *specific* finding regarding the value of the transferred assets—*i.e.*, that they were worth more than $90,000. R & T asserts, further, that in the absence of expert evidence of value, the trial court erred in applying a capitalization rate of 33 percent to determine Action's value at the time the business operations were transferred to R & T. Plaintiff responds that at no time during the trial did R & T contend that the evidence was insufficient to support the trial court's findings as to the value of the business and that the issue therefore is not preserved.

We pause to consider whether there is any practical significance to the trial court's determination that the transferred assets had value exceeding $90,000. R & T does not explain how the trial court's allegedly incorrect valuation of the business renders its judgment for plaintiff erroneous; rather, it merely argues that the trial court's findings are

---

[7] The entire assignment of error consists of the statement, "The trial court's findings of fact are not supported by the evidence."

unsupported without identifying any flawed legal conclusion that is premised on those findings.

We decline to provide a legal rationale or conclusion that R & T has not provided itself. Had R & T not relied entirely on the notion that the *only* assets transferred were Action's equipment and inventory, it might have been able to argue that the amount by which the transferred assets—*including the intangibles*—exceeded Key Bank's security interest was relevant to the remedy to which plaintiff was entitled. As noted, under ORS 95.270(2), in an action seeking to avoid an asset transfer to the extent necessary to satisfy a creditor's claim, "the creditor may recover judgment for the value of the asset transferred * * * or the amount necessary to satisfy the creditor's claim, whichever is less." Thus, the value of the property fraudulently transferred—in this case, as the trial court found, Action's business—potentially could have been relevant to the determination of plaintiff's remedy, had R & T contended that its business value was something less than the amount of plaintiff's claim.

But R & T never asserted that the business was worth less than plaintiff's claim. Because R & T was inexorably focused at trial (and on appeal) on its assertion that only the equipment and inventory were transferred and that it paid reasonably equivalent value for those assets, it never seriously addressed plaintiff's position—which the trial court accepted—that Action's *business*, including intangibles, was transferred to R & T.[8] R & T also never asserted that the business operation was worth something less than plaintiff's judgment against Action, even after the trial court indicated that it was inclined to find that the entire business was transferred. In light of the limited focus of R & T's arguments, the trial court had no reason to consider whether plaintiff's award should be something less than the full amount of his judgment. Accordingly, the trial court's finding as to the specific value of the business was, essentially, superfluous. Put differently, R & T has not

---

[8] Notably, even in its third assignment, in which R & T explicitly argues that the trial court imposed an excessive remedy under ORS 95.260 and ORS 95.270, R & T does not argue that, assuming the trial court correctly found that the entire business operation was transferred, the amount of plaintiff's claim exceeded the value of the business.

established that it was prejudiced by any error associated with that finding. Consequently, R & T's fifth assignment of error presents no basis for disturbing the trial court's judgment.

Affirmed.